Santo et al. v. The State of Iowa.

------

## Santo *et al. v.* The State of Iowa.

The act entitled " An Act for the Suppression of Intemperance," approved January 22, 1855, is not in conflict with the constitution or laws of the United States.

The General Assembly cannot legally submit to the people, the proposition whether an act shall become a law or not.

The people have no power, in their primary or individual capacity, to make laws.

A statute void in part, is not necessarily void as a whole. If sufficient remains to effect its object, without the aid of the invalid portion, the latter only should be rejected, and the former allowed to stand.

The act for the suppression of intemperance, approved January 22, 1855, is a complete act in all its parts, without the eighteenth section.

Although the power of the judiciary to declare and hold an act of the legislature unconstitutional and void, is universally admitted, yet the exercise of that power, is considered of the most delicate and responsible nature, and is not to be resorted to, unless the case be clear, decisive and unavoidable.

It is the duty of the courts, to give to a statute such a construction, if possible, as will sustain it.

Where the language and provisions of a statute are consistent with a lawful end, and this is its apparent meaning, whilst another construction would give it an unlawful effect, it is the duty of a court to take that view which is lawful and consistent.

The whole of the act for the suppression of intemperance, approved January 22, 1855, is not rendered invalid, even though the submission to a vote of the

Santo et al. v. The State of Iowa.

people, as provided for by the eighteenth section of the act, should be held unconstitutional.

The eighteenth section of the act did not submit to the people the question, whether the act should become a law or not, and is not unconstitutional.

The statute does not embrace more than one object, nor objects not expressed in the title; and is not in violation of the twenty-sixth section of the first article of the constitution, which provides that every law shall embrace but one object, which shall be expressed in the title.

The act has been published, as required by the constitution of the state of Iowa.

A particular description of the place to be searched, or the property to be seized, is required by the act for the suppression of intemperance; and the charge alleged against the defendant is to be distinctly and fully stated.

The words "as particularly as may be," in the ninth section of the act for the suppression of intemperance, convey the idea of the greatest degree of certainty in the description of the place to be searched, or the property to be seized.

Under the statute, it is necessary to inform the defendant of the charge alleged against him, and it allows him to be confronted with the witnesses against him.

The statute does not authorize a destruction of property, without notifying the defendant; nor does it authorize a forfeiture and destruction of private property, without trial, and as a penalty for crime, which need not be proved.

The act to incorporate the city of Keokuk, approved December 13, 1848, and, the act amendatory thereof, approved January 22, 1853, confer upon the mayor of the city of Keokuk, the jurisdiction of a justice of the peace, under the criminal laws of the state; and the power thus conferred, is not in conflict with the third article of the constitution, which provides that no person charged with the exercise of powers properly belonging to one department of the government, shall exercise any functions appertaining to either of the others.

The seal of the city of Keokuk is a corporate seal, and not the seal of the mayor, when he acts as a justice of the peace under the laws of the state.

Section 175 of the Code, which provides that no sheriff, deputy sheriff, coroner, or constable, shall appear in any court as attorney or counsel for any party, &c., does not prohibit peace officers from making complaint of the violation of the penal laws of the state.

Where the defendants in a criminal proceeding before a justice of the peace, appeared and had a trial, without objecting to the information or warrant; and where, on appeal, the objection to the information and warrant was first raised in the District Court, which objection was not included in the affidavit for the appeal, and was overruled by the District Court; Held, That the defendants having appeared before the justice, and had a trial, without testing the sufficiency of the information and warrant, and it not being assigned as an error in the affidavit for the appeal, the objection was properly overruled.

And where on appeal in a criminal case, the District Court refused to grant a new trial on the errors assigned in the affidavit of appeal, and refused the

defendants a trial by jury; *Held,* That the District Court did not err in refusing a trial by jury.

Section 3361 of the Code, is applicable to cases under the act for the suppression of intemperance, and is not superseded by section ten of that act.

An assignment of error as follows: "In overruling various other motions and questions apparent upon the record, which is made part and parcel of this assignment of errors," is too broad and indefinite to be considered by the Supreme Court.

## *Error to the Lee District Court.*

THIS is a proceeding under the act for the suppression of intemperance, commenced before the mayor of the city of Keokuk, on the following complaint:

*The State of Iowa, Lee County, ss:*—Personally appeared before the undersigned, mayor of the city of Keokuk, in said county, James R. Judd, James Knight, and Mark P. Landon, residents of said county, who each being duly sworn, depose and say, that they have reason to believe that intoxicating liquors, viz.: whiskey and ale, and porter, and lager beer, and strong beer, are kept, and intended for sale, in violation of the law of the state of Iowa, entitled "an act for the suppression of intemperance," in the buildings upon the easterly part of lot two in block number one hundred and eighty-six, in the city of Keokuk aforesaid; said premises being occupied, and said liquors owned and kept, by a person of the name of Geofas Santo. And the said James R. Judd, one of the defendants aforesaid, further deposes and declares, that he has reason to believe, and does believe, that since the first day of July, A. D. 1855, intoxicating liquors have been sold in said house or building, and in some dependency thereof, in violation of the law of the state of Iowa, entitled "An Act for the Suppression of Intemperance," by the said Geofas Santo, and by his consent, and by his permission.          (Signed,)          JAMES R. JUDD,
                                                                         JAMES KNIGHT,
Subscribed and sworn to before me, ⟩ M. P. LANDON.
   this 28th day of July, A. D. 1855. ⟨
          D. W. KILBOURNE, *Mayor of the city of Keokuk.*

Upon this information, a warrant was issued and delivered to the marshal of Keokuk, commanding to search the premises, and seize the liquor described in said information, which warrant was returned on the 30th of July, 1856, with the following return indorsed thereon: "I did on the 28th day of July, A. D. 1855, search the within-described premises, and seized and have now in charge, the following described vessels of intoxicating liquor, viz.: eleven iron-bound kegs, each having the letters J. B. L. marked upon them, and containing liquor, beer and strong beer; also one wooden-bound barrel, having the words, 'double rectified whiskey,—Warsaw, Ill. D.' marked upon it, containing whiskey, and found on the premises occupied and kept by one Geofas Santo.

"M. P. LANDON,

"Keokuk, July 30th, 1855.    *Marshal of the city of Keokuk.*"

A notice was then issued, directed to Geofas Santo, and all whom it may concern, "requiring them to appear before the mayor on the 8th day of August next, and show cause why the vessels and liquors should not be forfeited, and also a venire for a jury, both of which were returned duly served. At the time fixed for the hearing, the defendants appeared, claimed to be the owners of the liquors, and their attorney filed a motion to dismiss the proceedings, containing *seventeen* reasons, which motion was overruled. The grounds of this motion will be found sufficiently stated in the opinion of the court. Other motions were made to dismiss the cause, because the court had no jurisdiction, and on other grounds, fully noticed in the opinion, all of which were overruled. Separate trials were refused a portion of the defendants, and the cause was submitted to a jury, who returned a verdict, that the liquors were forfeited, and at the time of their seizure, were kept to be sold in violation of law. Upon this verdict, the mayor entered a judgment, that the said liquors were forfeited, and that they be destroyed, and that the defendants pay the costs. The defendants then filed their affidavit for an appeal, alleging as error the overruling of their several motions, and filed their bond.

In the District Court, the defendants moved that the cause

Santo et al. v. The State of Iowa.

be stricken from the docket, and the proceedings quashed, for the following reasons:

1. Because the information and warrant are void, inasmuch as neither the place to be searched, nor the intoxicating liquors to be searched for and seized, are particularly described. Code, § 3293; also Const. Art. 1, § 8.

2. Because the complaint was made, and the warrant issued, in violation of section 175 of the Code of Iowa, it being admitted and proved, that Mark P. Landon, one of the persons who signed and subscribed the complaint or information, was at the time of signing and subscribing said information, and ever since hath been, and now is, city marshal of the city of Keokuk, and by the 11th section of an act, entitled "An Act to amend an act entitled an act to incorporate the city of Keokuk," the city marshal of said city of Keokuk shall, by virtue of his office, be a constable of Jackson township.

3. Because the information was not made before a justice of the peace, or the warrant issued by a justice of the peace, but the information was made before, the warrant, and notice issued, and judgment entered up by, the mayor of the city of Keokuk, who has no power or jurisdiction, or authority whatever, over or in proceedings prescribed in the 9th, 10th, and 11th sections of the act of the legislature, entitled "An Act for the Suppression of Intemperance," under the provisions of which these proceedings are professedly and really instituted.

4. Because the act of the legislature of Iowa, entitled "An Act for the Suppression of Intemperance," under which these proceedings are instituted and prosecuted, is null and void, being passed in violation of the constitution of the state of Iowa, and constitution and acts of Congress of the United States.

This motion having been overruled, and the court, having refused a new trial, on the errors assigned in the affidavit of appeal, and refused a trial by jury, which was demanded by the defendants, proceeded to affirm the judgment of the mayor, and rendered a judgment against the defendants for costs in

both courts. From this judgment, the defendants have sued out their writ of error, and in this court allege the following errors in the proceedings below :

1. In overruling the motion to dismiss the proceedings.

2. In refusing the defendants a jury trial.

·3. In affirming the judgment of the court below.

4. In adjudging that the liquors were kept for the purpose of being sold, in violation of law.

5. In adjudging that the liquors were forfeited. ·

6. In ordering the defendants to pay the costs of appeal, as well as those below.

7. In ordering that the liquors be destroyed.

8. In overruling various other motions and questions, apparent upon the record, which is made part and parcel of this assignment of errors.

*Marshall & Moss*, for the plaintiffs in error, contended :

I. The District Court erred in overruling the motion to dismiss :

1. The information and warrant are void for uncertainty, and not containing matter required by the "Act for the Suppression of Intemperance." See the act, § 9, Am. L. Reg., June number, 1854.

2. The warrant was issued, and the complaint made, in violation of the 175th section of·the Code of Iowa, which provides that "no sheriff, deputy sheriff, coroner, or constable, shall appear in any court as attorney or counsel for any party, nor make any writing or process to commence any suit, or be in any manner used in the same; and such writing or process made by any of them shall be rejected." Mark P. Landon, one ·of the informants, who signed, subscribed, and filed the information in this proceeding, it is proved and admitted, and so appears of record, was city marshal of the city of Keokuk; and, by virtue of his said office of city marshal of the city of Keokuk, a constable of Jackson township, qualified and sworn into office as said constable. See § 11 of Amended Charter of the city of Keokuk, Stat. 1853, 136. A complaint made by one of those

officers is void, and must be rejected.  The signing and filing of said complaint, is making a writing or process to commence a suit.  The complaint certainly would not have been good, without his affidavit and signature, as only two informants would have been left, and the act of the legislature, under which the case is brought, requires three.  The 175th section of the Code extends to criminal, as well as civil process.  It was intended to prevent those officers from hunting up cases, and instituting suits, for motives of gain.  Other states have similar provisions in their statutes.  Connecticut has the following:  " If any sheriff, deputy sheriff, or constable, shall draw or fill up, any writ, process, or declaration, except in his own case, it shall abate."  Revised Statutes, 1849, 582.  This statute has always been held to apply to criminal cases.  A criminal proceeding is, unquestionably, a process.

3. *The warrant was not lawfully served.*  Mark P. Landon, who served the warrant, is one of the informants.  A warrant served by a prosecutor, is not legally served.  It must be served by an officer, or person indifferent, as between the parties.  An act of a legislature, authorizing a man to sit in judgment on his own cause, is void, as being against common right and reason.  *Calder* v. *Bull*, 3 Dall. 386; *Dr. Bonham's Case*, 8 Rep. 118; *Reid* v. *Wright*, 2 G. Greene, 150; *Taylor* v. *Porter*, 4 Hill, 140; *Rice* v. *Foster*, 4 Harr. (Del.) 477.  The same rule holds good as to service of process.  " If a person not authorized to make service of process, should serve a warrant, such service is illegal, and a judgment rendered thereon, is extra-judicial and void.  *Case* v. *Humphry*, 6 Conn. 130; *Eno* v. *Frisbie*, 5 Day. 122.  The defendant, to take advantage of the matter, is not obliged to plead it in abatement; but the court will *ex officio* dismiss the writ.  Even if a statute contemplated a plea in abatement, still it would not take away the common law remedy.

4. The mayor of the city of Keokuk has no jurisdiction, power, or authority, over, or in, proceedings prescribed or authorized by the 9th, 10th, and 11th sections of the act of the

legislature, entitled, "An Act for the Suppression of Intemperance," under the provisions of which these proceedings were professedly and really instituted. Now, the rule of law is, "that, statutes conferring jurisdiction, are to receive a strict construction." *Palmer* v. *Palmer*, 6 Conn. 409. The principles of construction applicable to remedial statutes, are inapplicable to statutes prescribing the jurisdiction of courts. *Ib.* 409. In relation to superior courts, or courts of record, the law is, that nothing shall be intended to be out of the jurisdiction of a superior court, but that which specially appears to be so; and, on the contrary, nothing shall be intended to be within the jurisdiction of an inferior court, but that which is expressly alleged. *Beaubien* v. *Brinkerhoff*, 2 Scam. 269. No presumption is to be made in favor of an inferior tribunal. Its jurisdiction must appear on the face of its proceedings. 5 U. S. Dig. 249. If a statute create a new offence, or cause of action, and provides that a particular tribunal shall take cognizance of it, no other court can enforce the law. *Aldrich* v. *Hawkins*, 6 Blackf. 125. A court of inferior jurisdiction, cannot take cognizance of an action to recover a statute penalty, unless jurisdiction is given in express terms. *Bowers* v. *Greene*, 1 Scam. 42.

5. The act under which these proceedings are professedly instituted and prosecuted, entitled, "An Act for the Suppression of Intemperance," is null and void, being passed in violation of the constitution of the state of Iowa, and the constitution and acts of Congress, and of common right and reason. Statutes inconsistent with the constitution of this state, or with the constitution of the United States, are void. If an act of the legislature is repugnant to the constitution, it is *ipso facto* void. 12 Wheat. 270; 2 Peters, 522. Statutes, or acts of legislation, against common right and reason, are void. *Dr. Bonham's Case*, 8 Rep. 118. *Lord Coke*, in the last-named case, gives some twenty-three authorities for the position that an act of parliament, against common right and reason, is void.

II. Now, the plaintiffs in error in this case claim, that the

" Act for the Suppression of Intemperance," is null and void.

1. It was passed in violation of those formal rules required by the constitution of the state of Iowa, to be observed in the passage of statutes. The constitution prescribes, *first*, That every law shall be so framed as that it shall " embrace but one object, which shall be expressed in the title."   Const. Art. 3, § 26.   *Second*, The legislative authority shall be vested in a Senate and House of Representatives, which shall be designated as the " General Assembly of the State of Iowa," and that bills may originate in either house, except bills for revenue, which shall always originate in the House of Representatives, and may be amended, altered, or rejected by the other; and every bill having passed both houses, shall be signed by the speaker and president of their respective houses.   Every bill which shall have passed the General Assembly, shall, before it becomes a law, be presented to the Governor.   If he approve, he shall sign it; but if not, he shall return it, with his objections, to the house in which it originated, which shall enter the same upon the journal, and proceed to reconsider it; if, after such reconsideration, it again pass both houses, by yeas and nays, by a majority of two-thirds of the members of each house present, it shall become a law, notwithstanding the Governor's objection.   If any bill shall not be returned within three days after it shall have been presented to him, Sundays excepted, the same shall be a law, in like manner as if he had signed it, unless the General Assembly, by adjournment, prevent such return.   Const., Art. 3, §§ 16 and 17.

Every law must be so framed as that it shall,

1. Embrace but one object.

2. Shall not contain any object not expressed in the title. To ascertain the meaning of the term " object," as used in the constitution, we must resort to some rule of construction. That rule, furnished by the Code of Iowa (section 26), makes it necessary for the court to construe words according to the approved usage of language, and the word object, as used in the 26th section of 3d article of the constitution, con-

strued according to that rule, must be declared by the court to mean "*something* presented to the mind—that to which the mind is presented for accomplishment or attainment."— *Webster*. Any · law, or rather act, of the legislature, so framed as to present more than one subject to the mind for accomplishment or attainment, is null and void, and courts. are bound to refuse them their sanction. The act of the legislature, entitled, " An Act for the Suppression of Intemperance," is objectionable, in being so framed as to embrace more than one object. Each one of its eighteen sections, present to the mind distinct subjects for attainment, neither of which are logically and legitimately related to each other, or so dependent upon each other, as that one cannot be carried out, without the aid of the other. The act provides for the punishment of drunkenness; for the prohibition of the manufacture and sale of intoxicating drinks; for declaring liquors, kept for sale in a certain manner, a public nuisance; for the appointment of county agents; for the establishment and furnishing of a county liquor shop; for a method of rendering accounts; for a new and extraordinary liquor proceeding; for declaring buildings a public nuisance; for declaring lands a public nuisance; and for some eight or ten distinct objects, which will be more distinctly noticed in another part of the argument.

The " Act for the Suppression of Intemperance " contains objects not expressed in the title. The title declares the object of the law to be the " suppression of Intemperance." No matter or subject not legitimately, and with certainty, promoting that end, and tending to that ultimate purpose, can lawfully or constitutionally be included in the act. The word " Intemperance," according to the approved usage of language, means " want of moderation or due restraint;" excess in any kind of action or indulgence—habitual indulgence in drinking spirituous liquors. — *Webster*. Whatever is included in that act, which is not logically directed to the suppression of excessive and habitual indulgence in drinking spirituous liquors, is illegally there, and renders it liable to the objection of " embracing objects not expressed in the

title." The professed object of the act is, not the suppression of the traffic in intoxicating liquors, or the destruction of liquors kept for sale in a particular manner, or to prohibit its manufacture; but to suppress the habitual indulgence in drinking spirituous liquors. Neither is the "expressed" object of the act, the suppression of the traffic in strong drinks, or even of the habitual indulgence in drinking strong drinks; and all those provisions tending to, and providing for, the destruction of spirituous liquors, or for the suppression of the traffic in those articles, or the suppression of the habitual indulgence in drinking strong drinks, are unconstitutionally inserted, and under the act, void. Out of some twenty or more objects included in that act, one only is fairly indicated by its title, and that is the provision which provides for the punishment of drunkenness. See Amer. Law Reg. August, 1855. As to constitution of jury, see 1st How. (Miss.) 163; 3 English, 436. Submitting the act to the popular vote was unconstitutional. Amer. Law Reg., Sept. 1853; Ib. Aug. 1854; *Rice* v. *Foster*, 4 Har. 477; *Parker* v. *Commonwealth*, 6 Barr, 509.

*J. P. Hornish*, for the state.

This case raises the question of the constitutionality of the act of 1855, "for the suppression of Intemperance." The first thing to be determined is, the sufficiency of this law, for if it is unconstitutional, then all further inquiry into the merits of this case, is useless. Is this law unconstitutional? "Pursuing and obtaining safety and happiness," as well as enjoying and defending life and liberty, and acquiring, possessing, and protecting property, are among the inalienable rights of man. Const., Art. 1, § 1 and 2. "The government may by general regulations *interdict* such use of property, as would create *nuisances*, and become *dangerous* to the lives, or *health*, or peace or comfort, of the citizens." 2 Kent, 340. The regulation of the sale of intoxicating liquors, is a police regulation, and the legislature may prohibit the sale altogether, and declare the traffic a nuisance. 5 How. 528;

*King and Cooper* v. *The President and Trustees of the town of Jacksonville,* 2 Scam. 305; *Bepley* v. *The State,* 4 Ind. 264; *Beal* v. *The State,* 4 Blackf. 107; 6 Greenleaf. 412; 9 Wheat. 203; 2 Amer. Law Reg. 466—this is the Massachusetts case, and although it holds that law unconstitutional in many respects, yet it concedes this power to the legislature. *Jones* v. *The People of the State,* 14 Ill. 196; 4 U. S. Stat. at large, 732; where the United States prohibited the sale, and declared the liquor forfeited. The legislature is to be the judge of what is a proper subject of legislation, and of the policy and expediency of laws. Liv. Law Mag. 124.

It is within the power of the courts to abate nuisances, or even for individuals, on their own suggestion. This power has never been doubted. 3 Cal. 72; *Meeker* v. *Van Rensselaer,* 13 Wend. 397; 2 Bouv. Inst. 514; 3 Black. Com. 5. The power to declare a nuisance admitted, the power to abate follows, as a necessary consequence. An offence being created, the addition of the necessary means for detecting the offenders and punishing the offence, must be inherent in the body having the power to create the offence, and they are to be the judges of what means are necessary; and the courts should not interfere, although they should appear extraordinary in some respects, so long as they do not plainly violate constitutional rights. The right of the legislature to declare property used for, or in the commission of crime, forfeited, has never been successfully denied. It has always been practiced, and even at common law, before justices of the peace, by summary process. 4 Blacks. Com. 281. Gambling devices are declared forfeited under our Code. § 2722; 1 U. S. Stat. at large, 349, 677; 4 U. S. Stat. at large, 732; 2 How. 231.

To authorize articles used in, or suspected to be used in, the commission of crime, to be forfeited and destroyed, is not new or unusual. 1 Chitty's C. Law, 65. Neither is the search and seizure authorized, unusual or unreasonable. 10 Johnson, 263; 11 Johnson, 500; 13 Mass. 286; 1 Conn. 40; 2 Starkie's Ev., old edition, 438; 33 Maine, 564; 2 Wheat. 246; 2 Peters, 358. It is somewhat singular, that

the seizure of a bottle, a jug, or a barrel, and its contents, should be considered very extraordinary or unusual, when it is admitted that they are the instruments of crime, and declared a nuisance, when kept in certain places and conditions. Is their any good reason why the instruments of crime, if they are productive of crime, should be any more regarded, than the person of the criminal? He may be searched for and seized, at any place, and at any time.

But it is said the power to enact this law was delegated to the people. Where is the provision delegating this power to the people? They cannot get it, by implication. To make a law depend upon a future contingency in relation to the time when it shall take effect, cannot be said, with any degree of reason, to be delegating legislative power. Liv. Law Mag., January, 1855, 13; 20 Ohio, App. 1; 1 Ohio, N. S., 77. This law does not, however, depend upon this section for its validity. It is a perfect law without it, and would not be affected by being found unconstitutional in this respect. Part of an act may be unconstitutional, and part constitutional. 16 Pick. 87.

This law, it is said, has more than one object. It is difficult to see in what respect it has more than one. The provision for taking the sense of the people, is nothing more than making provision for its publication would be. Is there anything in it, that does not relate to the same subject matter? If not, the act is not at fault in this respect. 5 Ind. 41.

The rules of evidence are changed, it is said. We cannot see in what respect. But if it were the case, is it not within the power of the legislature to modify the rules of evidence, by general and uniform laws. Code, § 926; 1 United States Statutes at large, 677, § 68; 1 Cond. Rep. 594; 16 Peters, 342; 1 Greenleaf's Ev. § 33; Archbold's C. Plead. 124.

In conclusion, upon the general character of the law, it may be remarked that the law of Iowa differs, in many important particulars, from the Massachusetts act: 1st. In the requisites of, and for, the warrants; 2d. In the description

of the places and the articles to be searched for; 3d. In naming the person in whose possession these articles are found; 4th. Notice to the owners; 5th. Day in court; 6th. Trial by jury; 7th. Declaring the articles when kept in certain places a nuisance, and the keeping an offence.

The other objections arising in this particular case, are: 1st. To the jurisdiction of the mayor of the city of Keokuk over this offence. The mayor, by virtue of the city charter, (§ 23,) has the same jurisdiction of criminal offences against the state of Iowa, as justices of the peace, and the proceedings before him are to be the same. By the statute of 1853, (§§ 12 and 13,) his jurisdiction is enlarged, and made to extend to all offences against the laws of the state, now in force, and hereafter to become in force. The only question is, is this a criminal offence? If so, then he had power to punish it, and to issue his warrant, the same as a justice of the peace, to bring the accused before him. It will not be disputed, that the mayor has power to issue search warrants for gambling devices, and yet the language of the law is the same as in this act. Code, § 2722, 1855. A special justice of the peace of the city of New York, has power to issue a search warrant, although it is a common law writ, and he is a creation of statute not known to the common law. 10 Johnson, 263.

The city marshal being *ex officio*, a constable, was one who joined in this affidavit before the mayor, upon which the warrant issued, which is forbidden by the Code, (§ 175,) as is alleged. To say that a peace officer has not the power, or the right, to do what is one of his highest duties, is simply absurd. This section was intended to prevent this class of officers from acting as attorneys, or agents for others, in the courts; but most clearly was never intended to prevent them from arresting, and causing to be arrested, known offenders against the laws. All objections to the sufficiency of the information and the warrant, are cured by the verdict. The goods will be held and forfeited, although the original seizure of them may have been a trespass. 16 Peters, 342; 13 Mass. 286.

Santo et al. v. The State of Iowa.

Many other objections are urged against the proceedings, which do not present themselves in such a form as to come under the supervision of this court. To the objection of being tried jointly, I would answer, that all the parties came by the same attorneys, and joined in the same plea of not guilty, and that it was a matter of discretion with the court, to grant or refuse separate trials. Nor is a court bound to hear a case alone. A jury trial is a right that may be demanded, but not refused. To the objections to the jury, I might say, that six men constitute a jury under our constitution, in cases before inferior courts. Facts passed upon by them, are just as binding, as if their number was greater. It is expected that every case shall be decided justly, and most certainly, the framers of the constitution intended and expected that six men were capable of dispensing justice, or they never would have constituted them a legal jury. Inferior courts are established, not for the purpose of experimenting with, but for the purpose of determining rights. But it does not appear that the jury were objected to on account of their number, which is necessary, in order to give the party the benefit of a jury of a greater number. 1 Wisconsin, 401.

But to return to the questions at issue, for this is a matter outside of the record. The only question remaining is: Did the court below err, in not granting a trial on the merits in this case? The right of appeal, does not imply the right of a trial by jury. The right of appeal from the District to the Supreme Court, is as much of a right, as it is from a justice's court to the District Court, and who would contend for a moment, that the appellant has a right to a jury trial in the Supreme Court? One jury trial is all that the law contemplates, unless it appears from the affidavit assigning errors, that injustice has been done to the defendant by the jury. If the errors assigned are mere questions of law, why try the case again upon its merits? All the errors complained of in this case, are errors of law, as appears from their own affidavit. The Code has wisely, in such cases, provided for passing upon such errors, without granting a new trial upon the

merits.    The whole complaint in this case is against the law, and not of the facts found under the law.

*David C. Cloud,* attorney-general, for the state.

Presumptions are always in favor of the constitutionality of a law, unless its unconstitutionality is clearly demonstrated, and courts will not declare a law unconstitutional, unless there is an actual conflict between the act and the constitution; a doubtful case will be decided in favor of the act of the legislature.

It is not to be expected that the constitution of a state will define all the powers of the legislature; nor is it for a moment to be presumed, that the framers of the state constitution could, by express articles, definitely prescribe legislative action upon any particular subject, much less upon all the numerous subjects which present themselves to a legislative body.    Such a constitution can only prescribe *certain general rules* of action, and leave the details with the legislature; and if the legislature does not transcend its power, so far as to remove all doubt from the mind of the court, its acts cannot be declared unconstitutional; the court may have doubts as to the constitutionality of a law, yet a doubtful case will not render it unconstitutional.

How far is the legislative action defined or restricted, by the constitution?    Article third of the constitution, is the only one that is devoted to the legislative department of the government.    Section first of the said article, invests the legislature with authority, and declares what shall be the style of their acts.    The twenty-fourth section of said article, directs how money shall be drawn from the treasury; section twenty-six declares, that every act shall have but one object, which shall be expressed in the title; section twenty-seven provides for the publication of the laws; section twenty-eight and twenty-nine prohibits legislative action in matters of divorce and lotteries; and all the residue of the article is devoted to the election and qualification of members of the legislature, their course of procedure in the enactment of laws, and directions for the taking of the cen-

sus, making apportionments, &c.   The general power of the legislature, upon other subjects, is not *defined* or *restricted.* It is left with the legislature to define crimes, and fix the punishment; and if, in the exercise of the discretion which it possesses under the constitution, it has declared the keeping and selling of intoxicating liquors, or any other acts, not before considered as criminal, to be crimes, it does not follow that such declaratory enactments are unconstitutional, unless they are expressly prohibited by article third of the constitution, or unless such acts conflict with the bill of rights, as set forth in article first of the constitution.   I apprehend, that in this particular, the constitution of a state differs from the constitution of the United States.

By the constitution of the United States, the powers of Congress are clearly defined, and any exercise of a power not expressly given to it by the constitution, would be void, for the reason, that all the powers not expressly given to the government of the United States by the constitution, are reserved to the states ; and while it would be the duty of the courts to declare an act of Congress void, for the reason that it is not within the scope of enumerated powers, a different rule will apply, when adjudicating upon an act of a state legislature, as all the acts of the legislature, be they ever so absurd, are constitutional, *if not prohibited by the constitution in such unequivocal terms, as to remove all doubts from the mind of the court.*

Upon this point, I would direct the attention of the court, to the case of " *Cooper* v. *Telfair*," 1 Cond. Rep. 211.   In the opinion delivered by the court, in this case, they say, that " the presumptions, indeed, must always be in favor of the validity of laws, if the contrary is not clearly demonstrated ;" and that " the general principles contained in the constitution, are not to be regarded as *rules to fetter and control*, but as matters merely *declaratory* and *directory*."

In the case above referred to, the question was, whether the state had the power before the adoption of the constitution of the United States, to banish, and to confiscate property for treason.   The court says, that " the power of con-

fiscation and banishment, does not belong to the judicial authority, where process cannot reach the offenders; and it is a power that grows out of the very nature of the social compact, and must reside.somewhere, and which is so inhe-- rent in the legislature, *that it cannot be divested or transferred, without an express provision of the constitution.*

If, without any express provision of the constitution for that purpose, a state legislature has power to banish a man for treason, and confiscate his property, has it not also the power to regulate the internal affairs of the state; to pre- scribe general rules of action for all the people therein; to declare new crimes, including the *crime* of making and sell- ing intoxicating liquor, and as a punishment for the viola- tion of its acts, can it not, when the constitution does not expressly restrict its powers, declare a forfeiture of those liquors, destroy them, and fine and imprison the offenders?

Where the constitution is silent, or where a reasonable construction of its provisions does not prohibit a certain act, can the performance of such act, be a violation of its pro- visions?

Does not the legislature possess absolute power over all matters not defined, directed, or restricted, by the constitu- tion ?   " *The courts will not pronounce a legislative act void, for repugnance to the constitution, except in a clear case.*"   See 2 Peters, 522; 12 Wheat. 270; 19 John. 58; 1 Cow. 550; 3 Dall. 386; 4 Dall. 309; 6 Cranch, 128.

"The constitutionality of a statute will be supported, un- less its unconstitutionality is so obvious as to admit of no doubt." *The State* v. *Cooper,* 5 Black. 258; 4 Black. 107; 4 Indiana, 264; 4 Ill. 196; Am. Law Reg. Vol. II, No. 8, 466; 4 U. S. Stat. at large, 832; Liv. Law Mag., Feb. 1854, 124; 1 U. S. Stat. at large, 347.

If the third article of the constitution does not restrict the legislature, or prohibit the passage of a law of the character of the prohibitory law, do the provisions of said law conflict with the " bill of rights," as specified in the first article of the constitution?   In section second of article first, it is declared, that "All political power is vested in the people;" that

"government is instituted for the protection, security, and benefit of the people, and they have the right, at all times, to alter or reform the same, whenever the public good may require it." This section clearly vests in the legislature, as the representative of the people, the right to enact all such laws as it may deem necessary for the protection, security, and benefit of the people; and if, in the exercise of the discretion thus vested in the legislature, it judged that the "protection, security, and benefit of the people," demanded a prohibitory liquor law, said law can be no violation of this section of the bill of rights. Does it violate section eighth of the bill of rights? This section declares, that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the papers or things to be seized."

The legislature has, in the "prohibitory liquor law" (see section 9th of the law), directed the mode of procedure, in nearly the words of this section of the "bill of rights." It certainly has—in this liquor law—guarded against unreasonable searches and seizures, and against any encroachments upon the rights of the accused, leaving no discretion with either the informant or the magistrate; *there must be probable cause, before a warrant can issue.* The law declares the manufacture or sale of intoxicating liquors to be a crime, and also prescribes the penalty for its violation. The constitution vests in the people, the right to do any act, conducive to the public good. The legislature has the right, whenever the public good demands it, to restrict trade, to prescribe how and where certain articles shall be kept, and in cases of disobedience, it has the right to prescribe the penalty; and no persons disregarding the law, can complain of an infringement of their constitutional rights, if the mode of search and seizure of their property, is such as is prescribed by the constitution. Does the "seizure" clause of the law, conflict with section eighteen of the "bill of rights?" Does

the law provide for taking private property for the public benefit, without adequate compensation for the same? I apprehend that this section does not apply to cases where property is seized for a violation of law. All persons are presumed to know the law; and if, in defiance of law, they commit an act, which the law says shall forfeit their right to certain property, can they then claim that their constitutional rights are invaded? If so, then there can be no fixed rule of action for the people, and every one must be his or her own judge, as to what may be their constitutional rights, and legislative acts will be of no force.

If a man so far disregards his duty to his fellows, as to use his property to their injury, and this, too, in violation of an express statute, can *he* successfully plead this section of the constitution? The constitutionality of laws creating offences, and prescribing penalties, including search, seizure, and forfeiture, has been established by the decisions of the highest courts in this country. See *Crowell* v. *McFadon*, 8 Cranch, 91; *Otis* v. *Watkins*, 9 Cranch, 337; *Otis* v. *Walter*, 2 Wheaton, 18; Act of Con., March 3, 1817, ch. 58; *Rose* v. *Himely*, 4 Cranch, 241–272; *The Mars*, 8 Cranch, 417; 1st U. S. Stat. at large, 677; Liv. Law Mag., Feb. 1854, 183; 16 Peters, 342; 3 Wheaton, 246; 4 U. S. Stat. at large, 733; 33 Maine, 564; 6 Cowen, 404.

It is contended that the law violates section 1st of the "bill of rights;" that it restricts the right of acquiring, possessing, and protecting property. To this, I answer, that while all men possess these rights under the constitution, yet no man can, in the exercise of what he conceives to be *his* constitutional rights, use his property, or enjoy it, in such a manner as to debar others of their rights. When the public good demands it, all are required to surrender certain natural rights, for the mutual benefit of the whole people. It is no violation of this section of the bill of rights, for the legislature to say, that one man shall not sell to another unwholesome bread, or meat, or that he shall not manufacture and sell intoxicating liquors; because, in the exercise of the discretionary power vested in the people of the state, by the

constitution, they have the right to say what laws shall be enacted for the "*benefit, security, and protection of themselves, and for the public good.*" When private interest comes in conflict with the public good, *private interest must yield*, especially when that *private interest comes in conflict with the law.*

The Code of Iowa defines nuisances, and provides for their abatement. This provision of the Code is but a re-enactment of the common law upon this subject; a law that courts have always enforced. *Anything that is a nuisance, may be abated.* The prohibitory liquor law declares, that the keeping and selling of liquors, except as prescribed by law, *is a nuisance*, and provides for its abatement. The legislature, acting for the people, have said, that the *public good demanded* that this nuisance should be abated, and I cannot conceive how their acts upon this subject, are in conflict with any provisions of the constitution. The man who continues the manufacture and sale of liquors in defiance of the law, is guilty of a crime, and has the same right to complain of a restriction of his constitutional privileges, as the horse-thief who is caught in his peculiar acts, and punished for the offence. The liquor seller and horse-thief are both equally guilty of a violation of law, and both have the same rights under the constitution. The legislature has the right, under the constitution, not only to declare what is a nuisance, and direct its removal, but, if not expressly prohibited, it may " enjoin, permit, forbid, and punish; it may declare new crimes, and establish rules of conduct for all citizens in future cases; it may command what is right, and prohibit what is wrong." See *Calder* v. *Bull*, 3 Dallas, 386; 15 Wend. 397; 3 Cal. 72; Bacon's Abridgment—Nuisance; 3d Blackstone's Com. 5; 2 Bouv. Inst. 574.

If the positions I have assumed be correct, then the legislature has the right to prohibit the manufacture and sale of intoxicating liquors, for the reason that it is a nuisance; and it also has the right, under the constitution, to declare the making and selling of intoxicating liquors to be a crime. Does section 18 of the prohibitory liquor law, render it uncon-

stitutional? The constitution prescribes the manner in which laws shall be enacted. The prohibitory liquor law was enacted in the manner prescribed by the constitution, independently of the provisions of section 18, and without this section, would have been published with the other acts of the legislature, and would have become operative at the time mentioned in this section. All that the constitution required, was observed, and without this section 18, it would have been a law of the state, on the first day of July, 1855.

Was the addition of this section an unconstitutional act? The enactment of it is neither directed or prohibited by the constitution, and so far as the law itself is concerned, it neither adds to, or diminishes it, in its operation. The law is not a *proposition* submitted to the people for their enactment, but rather a *law* enacted by the *legislature* in a constitutional manner, and then the question as to whether it shall go into operation, is left with the people. No law of a general nature takes effect as soon as enacted—something yet remains to be done; *it must be published.* When published it takes effect. The legislature directed, that in addition to the publication of this law, the people should vote upon it, and that if a majority voted in favor of prohibition, then the law was to go into operation, on the same day that it would have, if this section 18 had been omitted. I apprehend, that simply embracing within a law, a proposition which is not prohibited by the constitution, will not render the law unconstitutional. It is but the exercise of that discretionary power possessed by the legislature, a power which it must possess, and which cannot be taken from it, except by an express provision of the constitution. Although we may not readily see the object of certain provisions; although they are absurd, yet if they do not conflict with the constitution, they will not affect the law. *Where the constitution is silent, a law cannot be unconstitutional.* It must come in conflict with some provision of the constitution, before a court will pronounce it void. This section, not conflicting with any provision of the constitution, cannot prevent the operation of the law. In support of the

Santo et al. v. The State of Iowa.

position, I have taken upon this point, I would direct the attention of the court to the authorities referred to on the sixth page of this argument. Liv. Law Mag. Jan. 1855, 13 ; 20 Ohio, Appendix, 1; 11 Penn. 61; 1 Ohio, N. S. 77; 4 Indiana, 342 ; Am. Law Reg. No. 10 of Vol. II, 591 ; Am. L. R. Vol. I, No. 11, 661.

Admitting, for the sake of argument, that this section (18), is unconstitutional, does it render the law inoperative? Can an unconstitutional section appended to the end, but not affecting the operation of the law, destroy the law? I am aware, that the courts must so construe an act, that the whole may, if possible, stand; yet it is equally well settled, that where a part of a law is constitutional, and a part of it is unconstitutional, that part of the law which is constitutional, will be supported and enforced, if enough is left to carry out the object designed by the legislature. This section 18, appended to the end of the act, being unconstitutional, and constituting no part of the *law*, cannot affect the passage of so much as conforms to the constitution. Courts will disregard this section, for the reason that its enactment was not the exercise of any power vested in the legislature. Although in the enactment of the law, the legislature may have intended that its operation should depend upon an affirmative vote of the people, yet the court will disregard the intent as expressed in this unconstitutional provision, and will gather the mind of the legislature from so much of the law as is constitutional. In the case of *Campbell* v. *Union Bank*, 6 How. (Miss.) 625, it was decided, that " where portions of the law conflict with the constitution, and but a part is valid, the latter will be sustained and enforced, *if it can be separated from that which is unconstitutional.* If this decision is law, it applies with strong force to the law now under consideration. All that can be said of this 18th section is, that it is absurd. It neither makes the law better nor worse; and if my first proposition is correct, viz: " That courts will sustain a law, unless it is clearly unconstitutional," then I apprehend, that nothing in this 18th section, will destroy, or prevent the operation of the law now under consideration.

If a majority of the people had voted against this law, would it not have become effectual and operative, notwithstanding such vote? I apprehend, that if it has all the constitutional requisites, the courts will decide in favor of its validity—unless courts should say that we are returning to the first principles of a *democracy*, and that the people themselves, instead of their representatives, possess the law-making power—for the reason, that a vote of the people cannot be considered essential, being an act void of power for good or evil. Aside from the provisions of the act itself, did it not become a law of the land, after publication, by virtue of section 22 of the Code of Iowa? By virtue of this section, which is not repealed, or even suspended, if the 18*th section* of the prohibitory law *is* unconstitutional, the *law* was in force on the first day of July, A. D. 1855. This provision of the Code, is the law of the land, and applies as forcibly to this act of the legislature, as to any other; and the mere fact that the legislature attempted to suspend it, by an unconstitutional act, cannot affect its operation as a law. It must apply to the prohibitory law, and thus carry out the wish of the people, as expressed by their representatives in its enactment, and by themselves at the ballot-box.

Does the law contain more than one object? Is anything contained therein not expressed in its title? I think not. The whole act has reference to but one subject, viz: " The prohibition of the traffic in liquors." The vote of the people provided for, is upon this subject, and none other. All the provisions of the law, from section one to section eighteen, refer to the same object. If the law provided for a vote of the people upon any subject disconnected with, or independent of, the matter legislated upon, then, indeed, might it become a question for the consideration of the court. But where all that is done, or to be done, refers to the same subject matter, I cannot conceive how a court can, for a moment, seriously consider this proposition. I submit the case with the fullest confidence, that the positions I have assumed are in accordance with the decisions of other courts; and with the hope that the Supreme Court of the state of Iowa,

will decide in favor of the validity of the *Prohibitory Liquor Law.*

WOODWARD, J., (WRIGHT, C. J., dissenting.)—This case arises under the act entitled : " An act for the Suppression of Intemperance," approved January 22, 1855 ; and thus are raised among us, some interesting questions, which have been so considerably discussed in several of our sister states. These questions are approached with all the sense of responsibility, and with all the solicitude for the attainment of right, which belong to their nature and their importance. Such are their well known relations, and such the interest felt by the public in the possible fate of this act of the General Assembly, that these are the last questions, and this the last occasion, upon which we should venture to indulge in theorizing, or to reason upon merely theoretic grounds. This mode of treating the subject, would be not only unsafe for a judicial tribunal, but also unsatisfactory to other minds. Such has been found to be the case, in respect to several opinions upon some one or other of the questions involved.

All acknowledge the great principles, and probably the lesser rules also, by which these cases must be tried ; but the main difficulty in this, as in many legal matters, lies in the just and true application of those principles and rules, about which there is no dispute. To make this just application in the matter at bar, it is more than usually necessary to keep near to, and within sight of, the well known shores ; to sail in waters which have been often navigated; and not launch out into the broad sea of speculation upon human rights. That which all the states have been accustomed to do—those things which have commonly been held right— those decisions which courts have made in past time, in reference to other subjects, of an analogous nature, or involving similar principles—must be our guides. This is the only course which will satisfy the mind of the lawyer, or of any other thinking man.

It is often true, that a proposition is seen, felt, and admitted to be true, whilst it is difficult to point out the process of

reasoning which leads to, or supports it, or to answer arguments which may be urged against it. This is true of many of the maxims lying at the basis of our political being. Who would doubt the proposition, that any one of our state governments, has the rightful power to protect itself or its public, the community, from the evils of pauperism, immorality, and crime? and yet how extensive and how difficult the range of argument through which the question carries us. The states have always exercised this power, and it has not been questioned, until it came to be applied to intoxicating liquors, the vast evils of the use of which, have been more especially observed within the past generation. If the states have not this power rightfully, the statute books of all of them, are lumbered by a mass of matter which has no place there; and if the power cannot be applied to this subject, it will be difficult to show the reasoning by which it can be applied to some others, to which it has always been applied, without doubting. It cannot be a question of degree, it is one of power or right.

There is no statistical or economical proposition better established, nor one to which a more general assent is given by reading and intelligent minds, than this, that the use of intoxicating liquors as a drink, is the cause of more want, pauperism, suffering, crime, and public expense, than any other cause—and perhaps it should be said, than ALL other causes combined. Even those who are opposed to restriction, oftentimes admit this truth. Every state applies the most stringent legal power, to lotteries, gambling, keeping gambling houses and implements, and to debauchery and obscenity, and no one questions the right and the justness of it; and yet how small is the weight of woe produced by all these united, when compared with that which is created by the use of intoxicating drinks alone. If by any process of reasoning, the state or the country is bound to support the pauper, to maintain a judicial system, in order to protect the community from crime, and to confine and maintain the criminal, then how is it possible to say, that she cannot look to the causes and sources of poverty and crime, and cut them

off, or dry them up.   But the right of these, our civil com-
munities, to protect themselves against intoxicating drinks,
is denied, and for this there are two processes of reasoning.
The one is, that the liquors are property, and that the right
to make and the right to sell, are inherent in, or incident to,
the right of property.   The other is, that the laws of the
United States permit the importation; the right to import,
carries the right to sell, at least in original packages; the
right to sell in bulk, implies the right to buy, and the right
to break bulk and sell by retail, follows.   If this reasoning
and this result are correct, then, indeed, are the states help-
less.   They have not one of the most necessary attributes
of sovereignty, and even of individual right—that of self-
protection; and state sovereignty is a fancy.   Then, neither
state or United States, can exercise this power, which is al-
ways admitted to belong to every independent community.

But the argument in the case at bar, stands thus : This is
a limited, a constitutional government, and although the
people may, yet the legislature, under the constitution, does
not possess the power here claimed.   We proceed to con
sider this question, keeping as near as possible to the beaten
paths.   Let us see what doctrines have been held in some
cases, which may serve both as an answer to objections, and
as a basis for our own reasoning.

In the case of *Fisher* v. *McGirr*, and the other cases (1
Gray, 1), C. J. SHAW says : " We have no doubt that it is
competent for the legislature, to declare the possession of
certain articles of property, either absolutely, or when held
in particular places, and under particular circumstances, to
be unlawful, because they would be injurious, dangerous, or
noxious; and by due process of law, by proceedings *in rem*,
to provide both for the abatement of the nuisance, and the
punishment of the offender, by the seizure and confiscation
of the property, and by the removal, sale, or *destruction* of
the noxious articles.   Therefore, as well to abate the nui-
sance, as to punish the offending or careless owner, the prop-
erty may be justly declared forfeited, and either sold for the
public benefit, or destroyed, as the circumstances of the case

may require, and the wisdom of the legislature direct. Besides, the actual seizure of the property intended to be offensively used, may be effected, where it would not be practicable to detect and punish the offender personally."

This able judge then states the question to be, " whether the measures directed and authorized by the statute in question (the Massachusetts Act), are so far inconsistent with the principles of justice, and the established maxims of jurisprudence, intended for the security of public and private rights, or so repugnant to the declaration of rights and the constitution, that it was not within the power of the legislature to give them the force of law, and that they must be held unconstitutional and void ;" and that court were all of opinion that they were. These cases are referred to at this time, on account of the above views, and because these views are all that are required for such a law to stand upon ; and are thus unequivocally set forth by that court, in cases which are cited, and relied upon, apparently with confidence, as conclusive against the act before us. The points upon which those cases were decided, and the differences between the Massachusetts and Iowa acts, will be noticed hereafter.

There have been some cases determined in the Supreme Court of the United States, also, upon laws enacted upon this same subject, which command our attention. We are not unmindful of the distinction, which has been so urgently pressed in relation to them, that they determine the rights of the states only, under the constitution and laws of the United States, but do not touch upon their powers under their own constitutions. This is true. Yet in those cases, are thoughts and reasoning upon the powers of the states in relation to these subjects, which, coming from that tribunal, are entitled to our deepest respect and gravest consideration. And it would be puerile to pretend not to see nor regard, the *reasoning* of that branch, even in cases where they are not to be cited as authority. As we quote commentators and elementary writers, so, *a fortiori*, would we resort to the fountains from which the elementary writers themselves, draw.

Santo et al. v. The State of Iowa.

In the case of *New York* v. *Miln*, 11 Pet. 102, the Supreme Court say, that " it is not only the right, but the bounden and solemn duty of a state, to advance the happiness, the safety, and prosperity of its people, and to provide for its general welfare, by any and every act of legislation which it may deem conducive to these ends, where the power over the particular subject, or the manner of its exercise, is not surrendered or restrained, in the manner just stated; that all those powers which relate to merely municipal legislation, or what may, perhaps, be more properly called internal police, are not thus surrendered or restrained; and that consequently, in relation to these, the authority of a state is complete, unqualified, and exclusive."

The considerations and reasoning in the cases of *Thurlow* v. *The State of Massachusetts; Fletcher* v. *The State of Rhode Island;* and *Pierce* v. *The State of New Hampshire,* 5 How. 504, are very important in their bearings upon the present law of Iowa. The Massachusetts law prohibits a sale of liquors without license, in a quantity less than twenty-eight gallons, which was a quantity greater than the law of the United States permitted to be imported in kegs. The Rhode Island law forbade a sale without license, in a quantity less than ten gallons, which was a quantity greater than the law of the United States permitted to be imported in bottles. The New Hampshire law forbade a sale in *any quantity,* without license. Neither of the cases was against an importer. The first two cases, related to foreign liquors imported. The New Hampshire case, related to liquor of domestic production, transported coastwise from one state to another, viz: from Massachusetts to New Hampshire. The objections to these laws were based upon those provisions of the constitution (art. 1, § 8, cl. 3, and § 10), which prohibit a state laying imports or duties upon importations, and giving to Congress the power to regulate commerce with foreign nations and among the states. The constitutionality of each of these laws, was maintained. But such was the importance of the cases, and such the difference of the train of reasons by which the Supreme Judges arrived at their conclusions,

severally, that they nearly all gave their views, in one or more separate opinions. And in these, are views and reasons which help us on to a conclusion, on the various points made in the case at bar.

Chief Justice TANEY says (5 How. 577): "These laws may, indeed, discourage imports, and diminish the price which ardent spirits would otherwise bring. But although a state is bound to receive, and to permit the sale by the importer, of any article of merchandise which Congress authorizes to be imported, it is not bound to furnish a market for it, nor to abstain from the passage of any law which it may deem necessary or advisable, to guard the health or morals of its citizens, although such law may discourage importation, or diminish the profits of the importer, or lessen the revenue of the general government. And, if any state deems the retail and internal traffic in ardent spirits, injurious to its citizens, and calculated to produce idleness, vice, or debauchery, I see nothing in the constitution of the United States, to prevent it from regulating and restraining the traffic, or from prohibiting it altogether, if it thinks proper."

Mr. Justice McLEAN says: "The acknowledged police power of a state, extends often to the destruction of property. A nuisance may be abated. Everything prejudicial to the health or morals of a city, may be removed. Merchandise from a port where a contagious disease prevails, being liable to communicate the disease, may be excluded; and in extreme cases, it may be thrown into the sea. This comes in direct conflict with the regulation of commerce; and yet no one doubts the local power. It is a power of self preservation, and exists, necessarily, in every organized community. It is, indeed, the law of nature, and is possessed by man in his individual capacity. He may resist that which does him harm, whether he be assailed by an assassin or approached by poison. And it is the settled construction of every regulation of commerce, that, under the sanction of its general laws, no person can introduce into a community, malignant diseases, nor anything which contaminates its morals, or endangers its safety. And this is an acknowledged principle,

applicable to all general regulations.  Individuals, in the enjoyment of their own rights, must be careful not to injure the rights of others."  "The police power of a state, and the foreign commercial power of Congress, must stand together. Neither of them can be so exercised, as materially to affect the other.  The sources and objects of these powers are exclusive, distinct, and independent, and are essential to both governments.  The one operates upon our foreign intercourse, the other upon the internal concerns of a state.  The former ceases, when the foreign product becomes commingled with the other property of the state.  At this point, the local law attaches and regulates it, as it does other property. A state cannot, with a view to encourage its local manufactures, prohibit the use of foreign articles, nor impose such a regulation as shall in effect be a prohibition.  But it may tax such property as it taxes other and similar articles in the state, either specifically, or in the form of a license to sell.  A license may be required to sell foreign articles, when those of a domestic manufacture are sold without one. And if the foreign article be injurious to the health or morals of the community, a state may, in the exercise of that great conservative power which lies at the foundation of its prosperity, prohibit the sale of it.  No one doubts this in relation to infected goods or licentious publications.  Such a regulation must be made in good faith, and have for its sole object the preservation of the health or morals of society."  "When, in the appropriate exercise of these federal and state powers, contingently and incidentally, their lines of action run into each other, *if the state power* be necessary to the preservation of the morals, health, or safety of the community, *it must be maintained.*  But this exigency is not to be founded on any notions of commercial policy, or sustained by a course of reasoning about that which may be supposed to affect, in some degree, the public welfare.  The import must be of such a character as to produce, by its admission or use, a great physical or moral evil.  Any diminution of the revenue arising from this exercise of local power, would be more than repaid by the beneficial result.

By preserving, as far as possible, the health, the safety, and the moral energies of society, its prosperity is advanced."

Justice CATRON, who may be considered as the least favorable in his reasoning, to the general views expressed above, in the same cases, says: "I admit as inevitable, that if the state has the power of restraint by licenses, to any extent, she has the discretionary power to judge of its limit, and may go to the length of prohibiting sales altogether, if such be her policy; and that if this court cannot interfere in the case before us, so neither could we interfere in the extreme case of *entire exclusion*, except to protect imports belonging to foreign commerce, as already defined." And he held that the states *had* the power of restraint by licenses, and, consequently, of *prohibition*, until Congress should pass some act regulating commerce between the states. These remarks were made in relation to the New Hampshire case, the law of which state forbade sales *at all*, without a license, including the importer in its terms; but in which case, the judge considered the liquors as standing upon the same ground as domestic liquors.

Mr. Justice DANIEL gives a greater latitude to the rights of the states, than the other members of that eminent court, and dissents from some restraints put upon the states, by the court, in the case of *Brown* v. *Maryland*, 12 Wheat. 419. In relation to the cases before that court, he says: "Every power delegated to the federal government, must be expounded in coincidence with the possession by the states of every power and right necessary for their existence and preservation." "The power to regulate this commerce (foreign), may properly comprise the times and places at which, the modes and vehicles in which, and the conditions upon which, it may *as a foreign commerce*, be carried on; but precisely at that point of its existence that it is changed from foreign commerce, at that point this power of regulation in the federal government must cease, the subject for the action of this power being gone." "But they (subjects of foreign commerce) must be continuing, and still, in reality, *subjects to foreign commerce*, and such they can no longer

be, after that commerce with regard to them has terminated, and they are completely vested as property in a citizen of a state, whether he be the *first, second,* or *third* proprietor; if this were otherwise, then by the same reasoning, they would remain imports, or subjects of foreign commerce, *through every possible transmission of title,* because they had been once imported." "It cannot be correctly maintained, that state laws which may remotely or incidentally affect foreign commerce, are, on that account, to be deemed void. To render them so, they must be essentially and directly in conflict with some other power clearly vested in Congress by the constitution; and, I would add, with some regulation actually established by Congress, in virtue of that power. In the case of *Brown* v. *The State of Maryland,* 12 Wheat. 419, it is said by the court, that liberty to import, implies unqualified liberty to sell at the place of importation. In the argument of this case, the proposition just mentioned does not, in all its amplitude, seem broad enough for counsel, who have contended that *liberty to import, implies,* on the part of the states, *a duty to encourage,* if not to *enforce,* the consumption of foreign merchandise, arising, it is affirmed, from a farther duty incumbent on the states, to regard, *a priori,* the acts of the federal government as wisest and best, and, therefore, imposing an obligation on the states for cooperation with them. These very exacting propositions, it is believed, can hardly be vindicated, either by the legitimate meaning of words, or any correct theory of the constitutional powers of Congress." "When importations may have been made with the direct view to sell, it does not follow by necessary induction, that permission for the former to import, implies permission for the latter to sell, nor the power of granting the former, the power of confining the latter; much less, that it implies the power or the obligation on the part of the government to command or insure a sale."

It was upon this point of the implied right of the importer to sell, that Justice DANIEL differed from the court. In relation to the argument, that the importer pays a duty

to the government, for the permission to introduce and vend his merchandise, he says: "In truth, no such right as the one supposed, is purchased by the importer, and no injury, in any accurate sense, is inflicted on him by denying to him the power demanded. He has, doubtless, in view the profits resulting from the sale of his commodities, but he has not purchased, and cannot purchase, from the government, that which it could not insure to him, a sale, independently of the laws and polity of the states. He has, under the legitimate power of the federal 'government to regulate foreign commerce, purchased the right to import or introduce his merchandise—the right to come in with it in quest of a market, and nothing beyond this. The habits, the tastes, the necessities, the health, the morals, and the safety of society form the true foundation of his calculations, or of any power or right which may be conceded to him for the sale of his merchandise, and not any supposed right in the federal government, in contravention of all these, to enforce such sale." "These stipulations (in treaties) no more signify that commodities shall be circulated and used free of all internal regulation, than they convey a positive mandate for their being purchased and consumed, eaten and drank, *nolens volens*, or at all events. Every state, that is in any sense sovereign and independent, possesses, and must possess, the inherent power of controlling property held and owned within its jurisdiction, and in virtue and under the protection of its own laws, whether that control be exercised in taxing it, or in determining its tenure, or in directing the manner of its transmission; and this, too, irrespective of the quantities in which it is held or transferred, or the sources whence it may have been derived."

In the same cases, Mr. Judge WOODBURY says: "It is not enough to fancy some remote or indirect repugnance to acts of Congress—a 'potential inconvenience'—in order to annul the laws of sovereign states, and overturn the deliberate decisions of state tribunals. There must be an actual collision, a direct inconsistency, and that deprecated case of 'clashing sovereignties,' in order to demand the judicial in-

terference of this court to reconcile them. *McCulloch* v. *Maryland*, 4 Wheat. 487 ; 1 Sto. Com. on Const. 432." " And what power or measure of the general government, would a *prohibition of sales* within a state conflict with, if it consisted merely in regulations of the police or internal commerce of the state itself." " The idea, too, that a *prohibition to sell* would be tantamount to a *prohibition to import*, does not seem to me either logical or founded in fact. For, even under a prohibition to sell, a person could import, as he often does, for his own consumption and that of his family and plantations; and also of revenue which would otherwise accrue from foreign imports, or from those of that particular article." This able judge further says: "But I go farther on this point, than some of the court, and wish to meet the case in point, and in its worst bearings. If, as in the view of some, these license laws were really in the nature of partial or *entire prohibition to sell certain articles within the limits of a state*, as being dangerous to public health and morals, or were virtual taxes on them as state property, in a fair ratio with other taxation, *it does not seem to me that their conflict with the constitution would, by any means, be clear.* Taking for granted, till the contrary appears, that the real design in passing them for such purposes, is the avowed one, and especially while their provisions are suited to effect the professed object, and nothing beyond that, and do not apply to persons or things except where within the limits of state territory, they would appear *entirely defensible as a matter of right, though prohibiting sales.*" " Whether such laws of the states as to license, are to be classed as police measures, or as regulations of their internal commerce, or as taxation merely, imposed on local property and local business, and are to be justified by all of them together, is of little consequence, if they are laws which, from their nature and object, must belong to all sovereign states. Call them by whatever name, if they are necessary to the well-being and independence of all communities, they remain among the reserved rights of the states, no express grant of them to the general government having been either properly or ap-

parently embraced in the constitution. So, whether they conflict or not, indirectly and slightly, with some regulations. of foreign commerce, after the subject matter of that com- merce touches the soil or waters within the limits of a state; is not perhaps very material, if they do not really relate to that commerce, nor any other topic within the jurisdiction of the general government." "As a general rule, the power of a state over all matters not granted away, must be as full in the bays, ports, and harbors within her territory, *intra fauces terræ*, as on her wharves or shores, or interior soil. And there can be little check on such legislation, beyond the dis- cretion of each state, if we consider the great conservative; reserved powers of the states, in their quarantine or health systems, in the regulation of their internal commerce, in their authority over taxation; and, in short, every local measure necessary to protect themselves against persons or things dangerous to their peace or their morals." "It is the undoubted and reserved power of every state here, as a po- litical body, to decide, independent of any provisions made by Congress, though subject not to conflict with any of them when rightful, who shall compose its population, who be- come its residents, who its citizens, who enjoy the privileges of its laws, and be entitled to their protection and favor, *and what kind of property and business it will tolerate and pro- tect.* And no one government, or its agents or navigators, *possesses any right to make another state, against its consent, a penitentiary or hospital, or poor-house farm,* for its wretched outcasts, or a *receptacle for its poisons to health, and instru- ments of gambling and debauchery.*"

Mr. Justice GRIER says: "Without attempting to define what are the peculiar subjects or limits of this (the state) power, it may safely be affirmed, that every law for the re- straint and punishment of crime, for the *preservation of the public peace, health, and morals,* must come within this cate- gory,—that is, of the authority being complete, unqualified, and exclusive. If the right to control these subjects be 'com- plete,' unqualified, and exclusive in the state legislature, no regulations of secondary importance, can supersede or re-

Santo et al. v. The State of Iowa.

strain their operations, on any ground of prerogative or supremacy.   The exigencies of the social compact *require, that such laws be executed before and above all others.*"   "It is not necessary for the sake of justifying the state legislation now under consideration, to array the appalling statistics of misery, pauperism, and crime, which have their origin in the use or abuse of ardent spirits.   The police power, which is exclusively in the states, is alone competent to the correction of these great evils, and all measures of restraint or prohibition necessary to effect the purpose, are within the scope of that authority.   There is no conflict of power or of legislation, as between the states and the United States; each is acting within its sphere, and for the public good, and if a loss of revenue should accrue to the United States, from a diminished consumption of ardent spirits, she will be the gainer a thousand fold in the health, wealth, and happiness, of the people."

Thus are given quotations from six of the nine judges constituting the supreme bench of the United States, and from each one who prepared an opinion.   If any apology is needed for the amplitude of these quotations, let it be found in the importance of the subject, and in the general want of correct information in respect to the views of that court upon these subjects.   Obtaining right notions of those views, we are enlightened upon the questions before us, and upon such similar ones as may arise.   It is cheering to find, in these opinions, that the reasoning of some *courts* even, receives no countenance from that bench; and that the rights conceded to the importer, are not considered as carrying with them such a train of consequences as has sometimes been held—consequences which take from a state the right of self-protection.

Let us now see what that court has judicially holden, which bears upon the questions before us.   The case of *Brown* v. *The State of Maryland,* was brought against the *importer* of dry goods.   The state law required such importer to take out and pay for a license to sell.   It was held, that the importer had a right to sell his imported goods in

their original packages, without further tax than the duties required by the law of Congress, and that the state law imposing a tax for a license, was invalid. In *Gibbons* v. *Ogden*, 9 Wheat. 1, it was held, that the power to regulate commerce between the states, given to Congress by the constitution, was not *exclusive* in Congress, until exercised—nor, perhaps, until there was a collision between regulations made by Congress and by a state. And the same view was taken in *Wilson* v. *Blackbird Creek Marsh Company*, 2 Pet. 251. In the above cases of *Fletcher* v. *Rhode Island*, and *Thurlow* v. *Massachusetts*, 5 How. 504, it was held, that laws requiring a license to be obtained before selling liquors (including foreign and imported) in less quantities than ten and twenty-eight gallons, were constitutional and valid. In *Pierce* v. *New Hampshire*, 5 How. 504, it was held, that a law requiring a license to be obtained, (which license might be refused,) before the sale of liquors in *any quantity*, was valid and constitutional, when applied to liquors imported from another of these states, Congress having made no regulations in relation to commerce between the states. In the above three license cases, all of the six judges who delivered opinions, recognize the authority of a state to *prohibit* the sale of spirits within its borders, as a police or internal regulation—excepting only the importer of foreign spirits, selling in the original quantities imported. There has been nothing decided, then, by the Supreme Court of the United States, with which the prohibitory law of Iowa conflicts. That act prohibits the sale of intoxicating liquors in any quantity ; but it saves the case of the importer. The objection, therefore, that this act is in conflict with the constitution or laws of the United States, is not well taken.

The second class of objections urged against the act under consideration, is, that in several of its provisions, or omissions to make provisions, it is a violation of some requirements of the constitution of the state, or of its spirit and meaning. As two of the objections in this class, are of a nature quite different from the others, it will be convenient to consider them by themselves. These are :

*First.* "That the statute under which the proceedings are commenced, is not a valid and existing law of Iowa, nor can be; for that the legislature of the state in the making thereof, delegated the power of its taking effect, to the contingency of a vote of the people in its favor."

*Second.* "That no publication of said law has been had, as the constitution of the state requires."

We will first consider the question relating to the submission of an act to a vote of the people. And on this subject, we entertain no doubts. The General Assembly cannot legally submit to the people, the proposition whether an act should become a law or not; and the people have no power, in their primary or individual capacity, to make laws. They do this by representatives. There is no doubt of the authority of the legislature, to pass an act to take effect upon a contingency. But what is a contingency, in this sense and connection? It is some event independent of the will of the law-making power, as exercised in making the law, or some event over which the legislature has not control. For instance, the embargo laws and their cessation, were made to depend upon the action of foreign powers in relation to certain decrees. The will of the law maker is not a contingency in relation to himself. It may be such in relation to another and external power, but to call it so in relation to himself, is an abuse of language. Now, if the people are to say whether or not an act shall become a law, they become, or are put in the place of, the law maker. And here is the constitutional objection. Their will is not a *contingency* upon which certain things are, or are not, to be done *under the law*, but it becomes the determining power *whether such shall be the law* or not. This makes them the "legislative authority" which, by the constitution, is vested in the Senate and House of Representatives, and not in the people.

It cannot be considered necessary to argue concerning the submission of acts of incorporation to the acceptance of the corporators. These are private matters, and not a part of the public law of the land. It is a question of private interest only, whether certain persons shall become a corpora-

tion; and, in the case of a strictly private one, probably the legislature could not make them such against their assent. And in the case of municipal corporations, they are, in the legal sense, private; and so they are in a common sense, to all practical intents. It is a question for the local community alone to determine, whether they will be incorporated, or whether they will be so as a town or city. This distinction is made practically, always and everywhere, whether it be founded in strict logic or not. The constitution prescribes the manner in which bills shall become laws, and acts or laws can be enacted in no other way. A certain body, or department, is created for this purpose, and no other has the smallest authority in that respect. Article 3d of the constitution is, in part, as follows: "The powers of the government of Iowa, shall be divided into three separate departments—the legislative, the executive, and the judicial. The legislative authority of this state, shall be vested in a Senate and House of Representatives, which shall be designated the General Assembly of the state of Iowa; and the style of their laws shall be, 'Be it enacted by the General Assembly of the state of Iowa.'" How is a law enacted? Section 16th of the same article, directs that "Bills may originate in either house, except, &c.; and every bill having passed both houses, shall be signed by the speaker and president of their respective houses." And section 17 provides that "Every bill which shall have passed the General Assembly, shall, before it becomes a law, be presented to the governor. If he approve, he shall sign it; but if not, he shall return it with his objections," &c. Then follow directions as to how it shall become a law, notwithstanding the governor's objections. It will be observed that there are, under the constitution, but three departments of the government; that the legislative department consists of the Senate and House of Representatives, and the people do not constitute a portion of it; and that laws are enacted "*by the General Assembly.*" This is the mode provided by the constitution, for making laws. A bill becomes an act or a law in the above manner, or it never becomes such. A vote

of the people cannot make it become a law, nor can it pre-
vent it becoming one.    After a bill has thus passed the two
houses, and received the approval of the governor, and thus
become a law by the constitution, how can a vote of the
people affect it?    As well might this court, submit the de-
cision of these causes to a vote of the people of the state, or
of a judicial district; or the governor his pardoning power.
If there is any efficacy in a vote of the people in *passing* a
law, then of course, it can be *repealed* only by a vote.

What effect, then, had the vote of the people?    None at
all, in a legal sense or manner.    The constitution made it an
act of the General Assembly, when it had passed the two
houses, and received the proper signatures.    But it is ar-
gued, that the eighteenth section, submitting the act to a
vote, is part of the act; and so becomes law with the rest.
The answer to this is, that if the General Assembly has no
authority to submit such a question, then such a provision
is void, and it will follow that either the whole act, or the
section containing the objectionable matter, is null and void.
The following are authorities on both sides of the question,
of submitting acts to a vote of the people.    The following
hold it constitutional:    *The State of Vermont* v. *Parkes*, 3 Liv.
Law Mag. 13; *Johnson* v. *Rich*, 9 Barb. 680.    The following
hold it unconstitutional:    *Thorne* v. *Cramer*, 15 Barb. 112;
*Bradley* v. *Baxter*, 15 Barb. 122; 1 Am. Law Reg. 658;
*Barto* v. *Himrod*, 4 Seld. 483, 4 Harringt. (Del.) 479; *The
People* v. *Collins*, 2 Am. Law Reg. 591; *Commonwealth* v.
*Williams*, 11 Penn. 61; *Parker* v. *Commonwealth*, 6 Barr.
507.

This leads us to the next step; which is, whether the
whole act, or the eighteenth section only, is invalid.    It is
assumed, for the present, that the matter was submitted to
the people in the largest and broadest sense.    This is uncon-
stitutional and void.    But an act void in part, is not neces-
sarily void for the whole.    If sufficient remains to effect its
object, without the aid of the invalid portion, the latter only
shall be rejected, and the former shall stand.    This doctrine
is clearly maintained in the Massachusetts cases.    *Fisher* v.

*McGirr* and other cases, 1 Gray, 1 ; 6 How. (Miss.) 625 ; *State* v. *Cox*, 3 Eng. (Ark.) 437 ; *Commonwealth* v. *Kimball*, 24 Pick. 361 ; *Morris* v. *Boston*, 4 Met. 288 ; *Clark* v. *Ellis*, 2 Blackford, 10. Now, the prohibitory act of Iowa is a complete act in all its parts, without the eighteenth section, submitting it to the people. No part depends, for its efficacy or practicability, on that section. It can be carried into effect as well without it, as with it. That section relates to nothing but the vote, the returns, publication of the result, and like matters. Testing this act, then, by the same rules which are applied to others, we see no reason why the whole act should be declared unconstitutional and void. It was not the vote of the people which was unconstitutional, but it was the submission to the people; and that part of the act was and is invalid, if it submitted the question whether it should be the law or not; and the vote was, to a legal intent, nugatory. It effected nothing. The act would have been law, had the vote been against it. Why the courts of some states have held an act submitted to the people to be void, rather than the mere act of submission—as in the case of the New York school law—does not clearly appear. Under our constitution and laws, there seems to be no difficulty, as will be shown in the next step of our inquiry.

Thus far, we have spoken in gross, and without discrimination, of the submission to a vote. But, if we are not correct in viewing the submission alone, as the invalid part of the act—in other words, if a submission to a vote of the people, renders the whole act void, then it becomes necessary to be more exact, and to see what was submitted, and in what terms or manner. Let us assume, for this part of the argument, that the whole act is rendered unconstitutional, if it was submitted to the vote, upon the condition that if the vote was in its favor, it shall be a law, and if the vote was against it, then it should not become a law. In the case of the New York free school law, section 10 provided, that " The electors shall determine by ballot, at the annual election, to be held in November next, *whether this act shall or shall not become a law.*" And section 14 was, that if a ma-

Santo et al. v. The State of Iowa.

jority of the votes should be against it, then "this act shall be null and void;" and if they should be in its favor, "*then this act should become a law, and take effect.*" In this case it was distinctly put to a vote of the people, whether the act *should become a law or not.* And if the legislature could, by any possibility, put from itself the determination of this question, it did so in that case.

But it is apprehended that the Iowa act, stands quite differently. The eighteenth, and last section is, in substance, as follows, certain parts being quoted literally :  " At the. April election, to be holden on the first Monday in April, A. D. 1855, the question of prohibiting the sale and manufacture of intoxicating liquor, shall be submitted to the legal voters of the state ;" then follow provisions concerning the election and the returns; the ballot is to be "For the Prohibitory Liquor Law," or "Against the Prohibitory Liquor Law ;" an official statement of the result of the vote is to be made and published; "and if it shall appear from such official statement, that a majority of the votes cast as aforesaid upon said question of prohibition, shall be for the prohibitory liquor law, then this act shall take effect on the first day of July, A. D. 1855 ;" but providing that those portions of the act which relate to the election directed in this section, should take effect from and after publication in the newspapers therein named.   The act is signed by the president of the Senate and the speaker of the House, and approved by the governor.  Now it is manifest, that here is no distinct submission to the people, of the question " whether this act shall or shall not become a law," as in the New York case. It is not provided that if the vote be against it, it shall not become a law, or that it shall not take effect.  The provision that if the vote be for it, it shall take effect on the first day of July, affords some little weight of argument against this view ; but it is not possible to give to the implication contained in them, a weight sufficient to override the argument drawn from the provisions of the constitution relative to the passage of laws, and from the want of power in the legislature.   And the more especially is this true, when a fair and

constitutional object for these provisions can be found, and a consistent meaning and proper effect, can be given to the provisions of the act, so as to give effect to the whole.

For some time after the establishment of the state government, it was doubted whether the judiciary possessed authority to declare and hold an act of the legislature unconstitutional and void, and the exercise of the power was declined by some courts. And now, although the power is universally admitted, its exercise is considered of the most delicate and responsible nature, and is not resorted to, unless the case be clear, decisive, and unavoidable. It is the duty of the court to give an act such a construction, if possible, as will maintain it. *Rice* v. *Foster*, 4 Harring. (Del.) 479; *Fisher* v. *McGirr*, &c., 1 Gray, 1.; *Maize* v. *State*, 4 Ind. 342; 20 Ohio, Append. 1; *Commonwealth* v. *Williams*, 11 Penn. 61; *State* v. *Cooper*, 5 Blackford, 258; 2 Pet. 522.; *Ogden* v. *Saunders*, 12 Wheat. 270; 19 Johns. 58, 1 Cow. 550; *Calder* v. *Bull*, 3 Dall. 386; 4 Dall. 309; *Fletcher* v. *Peck*, 6 Cran. 87. Every lawyer knows that it is a common argument, often resorted to, against some construction of an act, that that would be giving it an unlawful, an unconstitutional effect, and *therefore*, the legislature did not so intend it. And this is a legitimate argument, and one which not unfrequently prevails. Certainly some more words, and negative words, are wanting in this section, to compel a court to give it such a construction as will nullify the whole, or even the section alone.

But what meaning can be given it, which will leave it consistent and valid? Suppose the legislature, having enacted the law, designed to ascertain the moral sentiment of the people of the state on the subject of "prohibition," in order, first, that if the community should be in favor of that policy, the law might have the aid of the power of that public moral sentiment; and secondly, that, if the public voice should be against the policy, this might be certainly ascertained, and the law repealed. This would be entirely consistent with the constitution, and perfectly rational; for not only does our government peculiarly stand upon public

Santo et al. v. The State of Iowa.

sentiment, but it is also well understood, that a law of this nature, especially, requires the aid of the public moral sense, as well as its legal authority, for its enforcement. Had this been the intent of the law-making power, it could not have used language better adapted to it, with the slight exception above alluded to; nor, indeed, could *omission* of language have been more appropriate. And what the act does *not* say, is important, as well as what it does say. Now, when the language and provisions of an act are consistent with a lawful end, and this is its apparent meaning, whilst another construction would give it an unlawful effect, it is the duty of a court to take that view which is lawful and consistent. In view of the rules and considerations above suggested, which are the ordinary ones applied by courts to all acts of the legislature, we are constrained to hold:

1. That the whole act is not rendered invalid, even though the submission to a vote should be held unconstitutional.

2. That the vote called for in the eighteenth section of this act, was not upon the question, whether it should become a law or not, and therefore there is no sufficient objection, even to that section.

Another objection of a constitutional character arises under Art. 1, § 26, which is: Every law shall embrace but one object, which shall be expressed in the title. It is urged, that this act contains both more than one object, and objects not expressed in the title. The title is, "an act for the suppression of intemperance." It would require too much space to pass in detail, through the argument of the counsel in the case against Santo, on this question. He carries it farther than we are inclined to follow him. In the course of it, he substitutes the word *subject* for *object* (between which, it is apprehended, that there may be a distinction), and applies both of them to each *step* which may be taken toward the attainment of the *object* of the enactment. According to this argument, the provisions for the punishment of drunkenness, prohibiting the sale, declaring certain things nuisances, the appointment of agents, &c.,—each distinct idea or step—is severally a new *object*. We cannot concur in the objection. The act is en-

tirely free from it. Were the argument valid, an act could hardly extend beyond one period—certainly not beyond one section. Each step toward the main object, must be provided for by a separate enactment. Half the acts in the statute books, embrace several ideas or steps in the progress of their provisions toward the attainment of the main object. The object may be a broader or narrower one, but if it be a *bona fide* object for legislative attainment, and the several steps embraced in it, are fairly conducive to that end or object, it is still a unit. Under what other view, could a school or revenue act be framed or upheld. Does not each of these present a unity of object? Must they be divided into as many separate acts, as there are provisions to carry out the main end? Such is not the design of the constitution. This act presents a fair unity of object. See the case of *The State ex rel. Weir* v. *County Judge of Davis County*, post.

The next class of objections presented, arises from the following provisions of the constitution :

ART. 1.—SEC. 1. That all men have the right of acquiring and protecting property.

SEC. 8. The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches, shall not be violated ; and no warrant shall issue, but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the papers and things to be seized.

SEC. 10. That in all criminal prosecutions, the accused shall have a right to be informed of the accusation against him, and to be confronted with the witnesses against him.

SEC. 18. Private property shall not be taken for public use, without just compensation.

ART. 3.—SEC. 27. That no law of a public nature shall take effect, until the same shall be published and circulated in the several counties, by authority.

Let us keep in mind, what has been before said concerning the duty of a court to sustain an act of the legislative department of the government, if it can be done consistently, and to give it such a construction as will uphold it, if this

can be done fairly, rather than one which will overthrow it. We have said that we should not incline to theorize. Neither will we quote the merely theoretic writers. For a sufficient expression upon the rights of individuals, and of the state governments, reference is made to the quotations heretofore made from the opinions of the able men comprising the highest judicial tribunal in our country, and upon these we shall, for the present, rest. We will next endeavor to state, as connectedly as possible, and to notice, the objections arising under each of the foregoing provisions of the constitution. And, as there will be occasion probably to refer to the constitutions and laws of the United States, and of Indiana, Michigan, Wisconsin, Missouri, and Kentucky, it is here stated, once for all, to save repetition, that each of them has provisions like those above cited from that of Iowa, and either in the same terms (which is generally so), or in terms so similar, that no distinction need be taken—excepting that which relates to the publication of laws.

*First.* It is objected that there has been no publication of this act, as is required by the constitution. This objection is not explained and applied, so as to make it intelligible. Art. 3, § 27, provides only that the law shall not take effect, until published and circulated. It gives no detailed directions. The Code, § 22, makes general provision on this subject, and directs that acts of a public nature shall take effect, on the first day of July following the session : and that every such act shall be presumed to have taken effect at that time, unless the contrary appear, as provided in §§ 23 and 24. No facts are shown in the case, to make a question. We find the act in the volume of session laws, which was published before the first day of July, 1855, and believe it took effect on that day, by virtue of the above general provisions. But here it is objected, that a part of the act, that is, that part relating to the vote, is made, by the act itself, to take effect on the publication of the law in certain newspapers. We see no valid objection to this. By Art. 3, § 27, of the constitution, if the General Assembly deem a law of immediate importance, they may provide that it take effect by publica-

tion in newspapers. And it is no uncommon thing for an act to be made to take effect, in part at one time, and in part at another. This is generally true of our acts incorporating towns and cities, in which there is a submission to the acceptance of the citizens.

*Second.* We give our attention to the exceptions taken under Art. 1, sections 1, 8, 10, 18, above cited. They are thus enumerated:

1. No particular description of the place to be searched, or the property to be seized, is required by the act.

2. The charge is not required to be distinctly and fully made against the defendant.

3. The prosecution is a criminal one, and it is not made necessary to inform the defendant, nor need he be confronted with the witnesses.

4. It authorizes a destruction of the property, without notifying the defendant.

5. It authorizes a forfeiture and destruction of private property, without trial, and as a penalty for crime, which need not be proved.

6. It presumes the guilt of the accused.

7. It authorizes the abatement and destruction of property, real and personal, upon the fact of finding the liquor, without other proof.

8. It gives justices of the peace jurisdiction of an unlimited amount of property.

These questions, especially, we desire to try, and to test this law, by the laws here and elsewhere on other subjects.

1. As to the description in the search warrant. The act requires the place, person and property, to be described "as particularly as may be," and the argument is raised, that if the complainant describe them as particularly as *he* can, or as he knows how, this shall be held sufficient, however loose and indefinite it may be. This is giving a false and unnecessary sense to these words. They seem to us to convey the idea of the *greatest* degree of certainty. The constitutions of Missouri and Kentucky have the same language as our act—"describing the person, place or thing, *as nearly as may*

*be.*" Was this intended to loosen the particularity of the description required? On the contrary, it is giving additional emphasis to the word " particularly."

2. As to the manner of charging the offence. The objectors do not specify any defects. The act requires the charge to be made in like manner as is required in relation to other offences. It gives no especial directions, but, like other laws, describes the offence, and requires an information, and this must conform to the usual rules of law.

3. On informing the defendant, and confronting him with the witnesses. It is true that the act does not require that the defendant be arrested, nor is this necessary; but it requires a notice to him, as effectual, in substance, as when he is sued for any amount of indebtedness, and on which judgment may be rendered for a thousand or ten thousand dollars. And the act requires, or rather allows, him to be confronted with the witnesses, in the same manner that other provisions of law do. There is no distinction between this act and others, on these questions generally. The objections are drawn from another source, which will be noticed presently.

4. That the act authorizes the destruction of the property, without notifying the defendant. This objection is not founded in fact, and if it were, it is not clear that it would be valid.

5. That the act authorizes a forfeiture and destruction of private property, without trial, and as a penalty for crime which need not be proved; and,

6. It presumes the guilt of the accused.

The first clause of this objection is utterly without foundation. The act requires a trial as much, and in the same manner, as any other act does. The objection relating to the presumption of guilt, arises on the seventh section of the act, which is, in substance, " that no person shall own or keep intoxicating liquor, with intent to sell the same in this state ; and the proof of finding the liquor named, in the possession of the accused, in any place, except his private dwelling house, or its dependencies, shall be received and acted

upon, as presumptive evidence that such liquor was kept or held for sale, contrary to the provisions of this act." The charge that the act either presumes the guilt of the defendant, or inflicts a penalty for a crime, without proof, is not true, in fact. The objection intended, was probably, that the act presumes the guilt from certain facts, or from insufficient facts. The length of this opinion, already warns us, that we cannot enter fully into all the questions raised and suggested; and that we must not attempt to go at large, into that of the power of the legislature over the subject of evidence.

The act prohibits the sale of ardent spirits, and, consequently, forbids the keeping it, with intent to sell; and then it makes the keeping it in certain circumstances—or, if you please, in any *but* certain circumstances—presumptive evidence of keeping, with intent to sell. It does not forbid the use of it, nor the keeping it, but it cannot be kept free from legal suspicion, unless kept in one's dwelling-house or its dependencies. The dealer in gunpowder is often restricted to one place for keeping this portion of his property, and is forbidden, perhaps, to keep it within the town in which he lives, and transacts his business. The sale of spirits being prohibited, its possession is rendered a suspicious fact, unless it be so kept as to indicate an intent for private use. So, the possession of more than a certain number of counterfeit coins, or bank bills, is sometimes rendered presumptive evidence of an intent to utter. Illicit goods, found amongst a passenger's baggage, become strong presumptive evidence of an intent to evade the revenue laws. (1 U. S. St. at large, 662, § 40); and they are seized and forfeited. Goods entered under a false invoice, serve the same purpose, and are forfeited Same, § 66. By the Rev. Stat. of Indiana, 968, the knowingly retaining in possesssion, dies, plates, &c., used in forging coin, or notes, is presumptive evidence of an intent to use them. So, by the same law, keeping gaming tools is punished upon the same ground. And instances of the like kind, from the laws of all the states, could be multiplied. We have seen that the legislative authority of the state, ex-

Santo et al. v. The State of Iowa.

tends to its internal commerce and police, and to the health and morals of the community; and under this, a sound discretion is the only limit which can be prescribed to laws regulating the uses or possession of suspicious, injurious, or dangerous property.

7. Of the jurisdiction conferred upon justices of the peace. The exception is a novel one. It is not, that the justice has jurisdiction of offences of too high a grade, for in this respect, this act comes within the general provision of the Code; but it is, that incidentally, he may obtain cognizance of property of an undefined amount. Such a criterion for the jurisdiction of a justice of the peace in criminal cases, as is intimated in this objection, is not known to the constitution or laws of this state, nor of any other, of which we have any knowledge. This objection, if valid, would lie to all the laws of this and the other states, relating to the seizure of gaming tables and implements, of instruments and tools for counterfeiting, of obscene books and prints, &c.

We have thus adverted briefly, to all the several legal matters embraced in the exceptions taken to this act, and coming within the range of constitutional provision. But it is felt that this range of quotations, is not entirely complete and satisfactory, being limited to the objections actually assigned in the cases. And as there are three cases before the court, and the arguments in some of them, go beyond the errors assigned, in their bearing and spirit, and aim to cover broader ground, we will not feel ourselves rigidly confined.

The objection is not, that the power of search and seizure, given by this act, is unreasonable, within the meaning of the constitution. The term "unreasonable" in the constitutions of the states, has allusion to what had been practiced before our revolution, and especially, to general search warrants, in which the person, place or thing was not described. It is believed that no search warrant is unreasonable, in the legal sense, when it is for a thing obnoxious to the law, and of a person and place, particularly described, and is issued on oath of probable cause. The laws of the United States in

relation to commerce, go far beyond this act. 1 Stat. at large, 662. The officer is not required, generally, to have a warrant. A passenger's baggage is searched, and illicit goods are seized and forfeited. § 46. Goods removed from a wharf, &c., before they are weighed, gauged, measured, or whatever, are forfeited, and may be seized. § 51. Collectors, naval officers, &c., may board vessels within four leagues of the coast, and search them in "every part." §§ 54 and 99. Goods entered with a fraudulent invoice, are forfeited, and if the collector suspect it, he may seize them. § 66. The laws of the states generally, concerning the search of gaming houses, and the seizure of persons and implements; for the search and seizure of base coin, and counterfeiting tools, devices and implements; of lotteries and tickets, and of obscene books, prints and pictures; stand upon the same ground, and have no more legal virtue, than the warrant, search, and seizure required or permitted by this act; and if this must fall, by reason of any objection here urged, they must fall with it, so far as the principle is concerned. These have never been objected to, on constitutional grounds, although they have existed from the beginning of these governments. The supposed doubt has arisen, only on the present subject.

The same remarks extend to the objections based on the constitutional provisions concerning the right to acquire and protect property, and the other objections based on the idea of interference with private right, and on the destruction of property. All the laws above referred to, require the destruction of various kinds of property; they interfere with the individual's notions of the pursuit of happiness, with his supposed private rights, and his property. The legislative power is the supreme judge and guardian of the public health, safety, happiness and morals; and if the traffic in certain property, is held detrimental or dangerous to these, it may be prohibited, and such property illicitly held, kept or used, may be declared forfeited, and being forfeited, may be destroyed; and this is not taking private property for

public use, in any sense which any one attaches to the constitution.

There is one other manner of viewing this act, which may afford some satisfaction. It cannot but be observed, by one who compares, that the most of the objections presented against the Iowa act are, or seem to be, drawn from objections made to the Massachusetts act, in the cases of *Fisher* v. *McGirr*, *Commonwealth* v. *Albro*, and *Herrick* v. *Smith*, 1 Gray, 1. And for this reason it is, perhaps, that some of them are not more pertinent. On account of the general similarity of that act to ours, and of the important bearing which the rulings of that court, in those cases, have, or seem to have, on the questions here made, it will be useful to compare that act, and the points decided upon it, with our own law. This will be done as briefly as possible:

1. The court, in those cases, says: It is nowhere provided, in direct terms, that keeping, or having liquor deposited for sale, shall be in itself unlawful, and render the property liable to confiscation, or subject the owner, agent or other depositary, to a penalty therefor. This position of the court, or this fact in relation to the act, has an important effect in the reasoning and views of the court, which is traceable throughout the opinion. The Iowa act, section 7, provides, that "no person shall own or keep, or be in any way concerned, engaged, or employed in owning or keeping, any intoxicating liquor, with intent to sell the same in this state (or to permit the same to be sold therein), in violation of the provisions of this act;" and for the first offence, he is to pay a fine of twenty dollars; for the second, fifty; and for the third, &c., one hundred dollars, and to be imprisoned. We start, then, clear of the effect of this objection on the act of the Iowa legislature.

2. The Massachusetts act did not limit the officer's authority for seizing, to any liquors described, by quantity, quality or mark, nor to those intended for sale, but he was to seize *any* found in the place described. This objection is obviated by our act. It requires the liquors to be " described as particular as may be," in both the complaint and warrant;

and the officer is to be commanded to seize "the *said* liquor."

3. The other objections to the Massachusetts act, will be coupled together. It provides for the destruction of the property, and the punishment of the owner, without his being duly charged or summoned—without giving him a day in court—without providing for a trial—or for legal proof— and without giving him an opportunity to defend, and to meet the witnesses face to face. No one of these objections lies to the Iowa act. By this, if the proceeding is *in personam*, the party will be arrested and proceeded with, in the same manner as he would be for any other offence cognizable by a justice of the peace. If the proceeding is *in rem*, the party is to be notified, by a notice equal to that upon which a judgment for debt may be recovered against him. In relation to this objection, it is worthy of remark, that when goods are seized and libeled under the United States revenue laws, for a violation of them, it is not provided that the owner should be known, or named, or notified. Notice of the proceeding is given by advertisement and posting only, and the owner may appear and claim the property in the goods, and be let in to a defence, by giving bond to defend and pay the costs. Act 2 of Mar. 1799, § 89; 1 Stat. at large, 662, *et seq.* And as much as has been said in these cases, in relation to the presumption raised by the statute from certain facts, let us observe a provision in section 71, of the foregoing act of Congress. It is this: "In actions, suits, or informations to be brought when any seizure shall be made pursuant to this act, *if the property be claimed by any person*, in every such case the *onus probandi* shall be *on the claimant*," when probable cause has been shown in a complaint. This goes far beyond the act before us, and yet that law was made in a day when questions of personal right were tender ones. And the provisions of the constitution of the United States are, in these respects, like those of the constitution of this state, as well as of that of Massachusetts and other states. These laws of the United States have

stood nearly sixty years; why have they not been over-thrown?

The chapter of the Code relating to the sale of intoxicat-ing liquors, has never been questioned in these respects, and yet in some of them, it is, perhaps, equally liable to objec-tion, with either the Massachusetts or the recent Iowa act. By this latter, a day for trial is to be appointed, not less than five, nor more than fifteen days, after giving the notices; the complainants, or other witnesses, are to be summoned, and the trial is to proceed like other trials.    It is true that *all* of the *minutiæ* of the proceedings, are not detailed; nor are they generally, by the laws of this state, or of any state, where a new offence is created and made punishable. They are left to come under the general provisions of law in rela-tion to such matters, and a detail of them is not necessary in every instance.    They apply to all cases.

Whilst these Massachusetts cases have been relied upon as strong, perhaps conclusive, authority against the Iowa act; it is singularly true, that the Iowa act has especially and carefully guarded every one of those points on which the Supreme Court of Massachusetts decided against the va-lidity of their act.    So true is this, that the mind is led to the conclusion, that the draftsman of our act was acquainted with the other, and sought to avoid its difficulties.    And it affords us great satisfaction, that in following our legal con-victions in regard to the law of Iowa, we are not opposing any doctrine advanced by that able bench.    We conclude, then, that none of the objections made to this law, on con-stitutional grounds, are valid, and there remains nothing for us to do, but to examine the objections to the proceedings in the particular cases.

In the case of *Santo and others* v. *The State*, in a motion to dismiss the prosecution, seventeen reasons, of a constitu-tional nature, are assigned.    These are much divided and attenuated, so that it is difficult to take them up *seriatim*, but it is believed that the substantial thoughts involved in them, are embraced in the foregoing remarks.    The other objections to the proceedings, contained in the assignment

of errors, will be briefly noticed. The first error assigned, is in overruling the motion to dismiss the proceedings. This is understood to refer to the motion before the mayor, which contains the above seventeen reasons. Those of a different nature are the following:

*First.* That the mayor of the city of Keokuk, had no legal authority to entertain the cause. The charter of that city, approved December 13, 1848, section 23, and an act in amendment thereof, approved January 22, 1853, sections 12 and 13, are very distinct in conferring upon the mayor the jurisdiction of a justice of the peace, under the criminal laws of the state, and *make* him a justice, in substance, although they do not *call* him such in terms, as do the charters of some other towns. Should there be any constitutional objection to the above section in the amendatory act, it is not necessary to consider it now, as the original charter gives all the authority here required. The objection intended is, that the mayor is an executive officer, and that judicial authority is conferred upon him, in conflict with that provision of the constitution which says, that no person. charged with the exercise of powers properly belonging to one of these departments—the executive, the legislative, or the judicial—shall exercise any function appertaining to either of the others. These "departments," are the departments of the government of the state of Iowa. The mayor of the city of Keokuk, is not a part of the government of Iowa. He exercises none of the functions belonging to that department. Whatever executive offices he may perform, pertain to him only as an officer of that corporation. But we do not mean to say that he is an executive officer, in any proper sense. Similar provisions exist in the constitutions of all, or nearly all, the other states, and yet from time immemorial, similar powers have been conferred upon the mayors of cities. We are of opinion, that the objection is not well taken.

*Second.* The want of the mayor's seal on the warrant. The seal of the town is a "corporate seal" (see charter, § 1), and is not known to the general law of the land. It is not his

seal as a justice of the peace under the state law, and his court is not a court of record.

*Third.* It is objected that Mark P. Landon was a constable of Keokuk, and that the same person is one of the complainants. The Code, section 175, provides, that no sheriff, deputy sheriff, coroner or constable, shall appear in any court, as attorney or counsel for any party, nor. make any writing or process to commence [a suit, or a proceeding,] or to be in any manner used in the same, and such writing or process made by any of them, shall be rejected. It is quite unnecessary to extend the construction of this section, so far as to prohibit peace officers from making complaint of the violation of the penal laws. This would be without the letter, and against the spirit, of the section, and destructive of half the object and utility of those officers.

*The fourth objection is,* That the information and warrant are void, inasmuch as neither the place to be searched, nor the intoxicating liquors to be searched for and seized, are not particularly described. This objection was not made before the mayor, and is not included in the supposed affidavit of causes for appeal, but appears to have been first made in the District Court. The defendants having appeared before the mayor, and had a trial, without making this question, and it not being assigned as an error in the affidavit, it is not now open to inquiry.

The second error assigned to the proceedings of the District Court, is, the refusing the defendants a jury trial. The constitution, Art. 1, section 9, says: "The right of trial by jury, shall remain inviolate; but the General Assembly may authorize trial by a jury of a less number than twelve men, in inferior courts." Our law gives a jury of six, in trials before a justice of the peace. Sections 3358 and 3361 of the Code, have been so construed, as to leave in the District Court an authority to inquire into the appeal, so far as to determine whether a new trial should take place, and to grant or refuse it. See *Baurose* v. *The State,* 1 Iowa, 374. The section (3361) is ambiguous and difficult of interpretation, and that given it, may not be entirely satisfactory. In exer-

cising this authority, then, the court did not err. And whether it exercised it properly or not, is not made to appear. It is here assumed, that the general provision in the last-cited section of the Code, is applicable to this case, as to others; and that it is not superseded by anything in section 10 of the act in question. This is considered the true doctrine.

The next five errors assigned are:

3. In affirming the judgment of the court below.

4. In adjudging that the liquors were kept for the purpose of being sold, in violation of the law.

5. In adjudging that the liquors were forfeited.

6. In ordering the defendants to pay the costs of appeal, as well as those below.

7. In ordering that the liquors be destroyed.

There was a trial before the mayor, and a verdict rendered against the defendants by a jury; and if there was no error, for which the District Court should reverse the judgment of the mayor, and no ground upon which a new trial should be granted, then these things followed as legal consequences, and the court did not err therein.

The eighth error assigned, is " In overruling various other motions and questions, apparent upon the record, which is made part and parcel of this assignment of errors." This is too broad. It is not the office of the court to hunt for errors. And there is so much want of congruity between the positions taken in the different stages of the case—before the mayor—in the District Court, and in this court—that we may have noticed questions not really before us, but it has been our desire not to seem to avoid any question fairly presented. We are aware that some other points were started in the early stage of the case, but they have not been continued throughout the cause, and brought before us. Such is the irregular state of the papers, that it is somewhat difficult to ascertain what is properly presented. It may be, that there is *nothing* before us properly, for, to state one of the ambiguities of the case, the act, section 10, gives the defendant an appeal, if he, or some person for him, shall make an affidavit stating the

fact, showing the alleged errors in the proceedings or judgment complained of ; *and it is questionable whether there is such an affidavit in the case.* We have, however, treated a certain paper, or certain papers, as such.

The judgment is affirmed.

WRIGHT, C. J. (dissenting).—On one question, discussed in the foregoing opinion, I find myself unable to concur with the majority of the court. That question arises on the construction given to section eighteen of the act of January 22, 1855, which reads as follows:

"SEC. 18. At the April election to be holden on the first Monday in April, A. D. 1855, the question of prohibiting the sale and manufacture of intoxicating liquor, shall be submitted to the legal voters of this State, and at said April election, a poll shall be opened for that purpose, at the place of election in each township of each county. The vote on said question shall be by ballot, and the voters in favor of such prohibition, shall cast a ballot, whereon shall be written or printed, the words, "*For the prohibitory liquor law ;*" and the voters opposed to such prohibition, shall cast a ballot, whereon shall be written or printed, the words, "*Against the prohibitory liquor law.*" The said ballot shall be received and canvassed by the judges of election, in the same manner as ballots for the election of officers, and a return of the same shall be made to the county judge, in the same manner and at the same time, as provided for in the election of officers at the April election. Such return shall be treated by the county canvassers, in the same manner as returns for the election of officers, and an abstract of said vote, made upon a separate sheet, shall be forwarded to the Secretary of State, in the same manner and at the same time, as provided in the cases of abstracts of votes for Superintendent and District Court Judges, elected at any April election. The returns of said vote, so returned to the office of the Secretary of State, shall be opened and examined by the Board of State Canvassers, in the same manner and at the same time, as in the case of returns of election of officers had at said April election. Im-

mediately after such examination and canvass, the said Board of State canvassers shall make and publish an official statement of said vote; and if it shall appear from such official statement, that a majority of the votes cast as aforesaid upon said question of prohibition, shall be for the prohibitory liquor law, *then this act shall take effect on the first day of July, A. D.* 1855: *Provided,* however, that those portions of the act having relation to the election provided for in this section, shall be in force from and after its publication in the Iowa Capital Reporter and the Iowa Republican.".

I pass over the objection, urged by the plaintiffs in error, that this section provides for the taking effect of the law in a manner not recognized by the constitution. If this section had been entirely omitted, I grant that the act would have taken effect, like all other laws, on the first day of July, 1855. And therefore, so far, I think, it might properly be disregarded. But in my opinion this section has a meaning and purpose beyond this—going to the very life and essence of the law—and as such courts cannot disregard it.

A statute may be constitutional in part, and unconstitutional in other parts, and the constitutional provisions be upheld. But not so, where the void provisions are vital to the execution of such as are constitutional—or where the act itself, is passed in a manner unwarranted by the fundamental law. And I also grant, that it is competent for the legislature to pass laws, the operative effect of which may depend upon a contingency—or upon the occurrence or non-occurrence of a particular thing. Indeed, most, if not all, the laws on our statute books are more or less of this character. In all such cases, the law is complete and perfect in all its parts—no other than the constitutional departments have aided in passing the same—it is the *will* of the law-making power, to be applied and become operative, when the law is violated, or when the citizen shall claim the benefit of its provisions. But I think it quite different, when the law is made to depend, for its creation and existence, upon the *will or voice* of any other body or power, than that to which such power is alone constitutionally delegated.

The distinction is not in all cases, perhaps, susceptible of defi-
nite explanation, but to my mind it is, nevertheless, clear and
important.   For instance, I think the legislature may give
to the judges of the different counties, power to submit to
the people the question, whether any extraordinary expend-
iture shall be made for the construction of roads, bridges or
the like.   Such a law is the *rule* prescribed, and is not de-
pendent for its creation or life, upon the aid of any other
power.   Whether it shall ever be of any practical effect,
depends upon circumstances, but it is nevertheless a law.
But if, on the other hand, such a law had legislative sanction,
dependent upon the sanction of the county judge or the
people, it would have no life, without such approval, and I
maintain that it is not competent for the legislature to give
vitality to law, on any such method.

That this last proposition is true, I think, is manifest, and
indeed, on this subject, I do not understand, from the opinion
of the majority, there is any diversity of opinion.   But it is
claimed, that this law is not, by the 18th section, made to
depend, for its life and existence, upon the contingency of
a popular vote.   In other words, that, though a majority of
the votes cast at the said April election, had been "Against
the prohibitory liquor law," the act would, nevertheless,
have taken effect under the general provisions of the Code,
on the first day of July.   And this, I think, is the fair and
legitimate result of the argument.   For when the popular
vote is disregarded in considering the existence of the law,
it conclusively follows, that though the vote had been other-
wise, this act would, nevertheless, be the law of the land.
Or, in other words, the position is, that this section is of no
force, so far as the life of the law is concerned—but it was
to be enforced, whatever might be the result of that election;
and that such election was only provided for, to test the
minds of the people, and ascertain whether they would give
their sanction thereto.

In the first place, I never could have obtained the consent
of my mind, to declare this law in force, if the popular vote
had been otherwise.   And this, not because such holding

would be in violation of public opinion, but because I should regard it contrary to the manifest intention of the legislature. I am not, in my position as a judge, to control that will, when exercised within constitutional limits—but to carry it out, according to the best lights I can obtain. And, to say that it was the legislative will, that this law was to take effect, and become a rule of action, whatever the result of this election, to my mind would most palpably violate that intention, as gathered from the law itself, and circumstances contemporaneous with its passage. To so hold, would be to say that this section means nothing—is a blank—that the legislature provided for all the trouble, expense and form of an election, for no end or purpose. If so, then it was a deliberate fraud upon the people, and one which I do not believe was intended or thought of. But further, I cannot forget, nor have I a right to, that the submission of this law to a popular vote, and the propriety and constitutionality of such submission, was a question much discussed before, at the time, and after the passage of the law. And when I find a provision making such submission, I cannot feel justified in saying, that it had not some practical end in view.

It is said, however, that the practical end was this : If the people decided in favor of the law, then, having the moral power arising from their concurrence, the law would be more likely to be enforced. But this position, I think, is clearly inconsistent with the argument, that the law would have taken effect, whatever the result of the election. For, to say that this vote was only to obtain the moral influence resulting from popular approval—and to hold that the law would be in force, in violation of popular sentiment, if so expressed at such election, would be to use an argument that destroys itself. The reply to this is, that if the vote had been against the law, then the law, though in force, would not have been executed, and the next legislature would have repealed the same, and thus carried out the will of the people. But if, in the meantime, prosecutions had been commenced under the law, or if the legislature, at a subsequent session, should fail to repeal the law, then it must necessarily have been ex-

Santo et al. v. The State of Iowa.

ecuted, despite public opinion, and, as I think, in violation of the legislative intention, as expressed in the law itself.

But it is said again, that there are no negative words in this section; and that by the general provisions of the Code, this law would have taken effect by publication at the time therein fixed; and therefore, no conclusion can be drawn, that the vitality of the law was made dependent upon the will or vote of the people. Granting the premises, is the conclusion legitimate. Now, ordinarily, laws are passed to take effect from their passage; from their publication and distribution in pamphlet form; by publication in newspapers; on a day named, after such publication; or no time is mentioned—in which latter case, of course, the time of their taking effect would be regulated by the general law. The general law is, as before stated, that statutes shall take effect on the first day of July next after their passage. This section provides, that if it shall appear that a majority of the votes cast upon said question of prohibition, shall be "for the prohibitory liquor law," then the act shall take effect on the first day of July—the very day provided by law for the taking effect of all other laws. Had the time of its taking effect been some other than that named in the general law, the argument drawn by the majority of the court, from the absence of negative words, would, to my mind, have been stronger than at present. Then, it might have been urged with more plausibility, that if the vote was in favor, it was to take effect at the time named (say first of June); if against, then, of course, at the time of all other laws. But as it stands at present, the argument is this: If the people approve, the law shall take effect on the first day of July, but if they should *not* approve, then it shall, nevertheless, take effect on the same day. Where, then, let me ask again, the necessity of the election? I answer, none, except for one that was illegitimate, and in violation of the constitution. I regard that by this section, the legislature intended to say, and have in effect said, this: If the people approve this law, then our will is, that it shall take effect at the time of all other laws; if they do not, then our will is, that it shall not

take effect, either then or at any other time. In other words, notwithstanding the people have, by their constitution, vested legislative power exclusively in us, yet we will not exercise that power ourselves, but will call in the aid of a power unknown to the constitution. If this section does not mean this, then I affirm it means nothing.

But let me make one query here : suppose at this election, no vote had been cast, either for or against the law, in the entire state. Would it have been the law of the land ? If not, then I say, it is conclusive that the law was not enacted by the constitutional power, but depended for its validity upon another power. If it would have been a law, then I say, it would have been such, in violation of the express will of the legislature—for that expressed will is, that it should take effect dependent upon this very vote, and in the case supposed, we have no vote.

Our constitution vests the legislative power of this state, in a Senate and House of Representatives, known as a General Assembly. To legislate, is to enact or make laws. To enact or make laws, is to decree or establish the will of the supreme power, which, under the constitution, is this General Assembly—limited, of course, by the charter which confers the power. Believing then, as I do, that the General Assembly have not declared their will unconditionally in the law, but have called in the aid of a power not provided for, nor contemplated, by the constitution, to assist in its enactment, I cannot hold it to be in force. It had no life—no vitality—when it left the hands of the General Assembly. For its creation, it had to depend upon the breath given it by the popular vote. Without this breath, thus given, it never was designed to have an existence. And with it, I must regard it as being created and brought into life, in violation of the spirit of a constitutional government.

This character of legislation is novel, and we have but few authorities on either side of the question involved. These authorities are cited in the opinion of the majority, and I need not refer to them. That the highest tribunals of the different states, should differ upon a question, involving so

Santo et al. v. The State of Iowa.

many nice distinctions, and susceptible of much argument on either side, is but natural. After all the reflection which I have been able to give to the question, however, I am reluctantly led to the conclusion above indicated. I say reluctantly, because I would certainly prefer, if consistent with duty, to have an entire concurrence on a question so unsettled, and subject to so much controversy. But while I thus dissent, I may say, in conclusion, that I concur with the majority of the court, on the other constitutional questions discussed. I have neither sympathy nor favor to bestow upon those constitutional objections, which are urged against the main principles involved in this law. To promote the happiness, peace and prosperity of the state, is the highest duty of the legislator, and I know of no more certain means of accomplishing this, than to suppress intemperance, pauperism and crime. Those laws which restrain men from doing mischief to their fellows, while they may diminish the natural, increase the civil, liberty of mankind. Natural liberty must be so far restrained by human laws, as is expedient and necessary for the general advantage of the public, in order to constitute political or civil liberty. This restraint should not, of course, be wanton and causeless, but have in view the public advantage, and the general freedom of the people in those matters of importance, which alone can secure perfect independence, and a prosperous and healthy state of society. These objects, this law, in my opinion, contemplates, and was designed to accomplish. But a law ever so beneficent in its design, or beneficial in its consequences, must become such by the action of the legitimate constitutional power; and if not so enacted, should no more receive judicial sanction, than if ever so pernicious and dangerous. And it is because I do not believe that this law was so framed, that I do most respectfully dissent from the opinion of the majority.